# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Andres*, 2021 IL App (2d) 191146

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF NICHOLAS T. ANDRES, Petitioner-Appellant, and ALISSA ANDRES, Respondent-Appellee (Mirabella, Kincaid, Frederick & Mirabella, LLC, Respondent-Appellee). |
| District & No. | Second District<br>No. 2-19-1146 |
| Filed | August 13, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-D-2323; the Hon. Robert E. Douglas, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Natalie M. Stec, of Wolfe & Stec, Ltd., of Woodridge, for appellant.<br><br>Kira N. Albrecht and Lindsay C. Stella, of Mirabella Kincaid Frederick & Mirabella, LLC, of Wheaton, for appellee Mirabella Kincaid Frederick & Mirabella, LLC.<br><br>No brief filed for other appellee. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court, with opinion.
Justices Hutchinson and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1   This appeal arises from the petition for termination of maintenance filed by petitioner, Nicholas T. Andres (Nick), based on the cohabitation of his ex-wife, respondent, Alissa Andres with Larry Eastman and the resulting proceedings. The appeal raises several issues: (1) whether the trial court's determination that Alissa began cohabiting with Larry on November 27, 2017, instead of an earlier date, was in error, (2) whether the trial court erred in holding Nick in contempt for violating its prior orders to continue to pay maintenance during the pendency of the trial, where the trial court ultimately decided to terminate maintenance, (3) whether, for the purpose of determining past due child support on a previously entered order of support, the trial court should have applied a version of section 505 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505 (West 2018)) that became effective after the entry of the order of support, and (4) whether the trial court abused its discretion when it found that the amount of time billed by Nick's trial counsel, Mirabella, Kincaid, Frederick & Mirabella, LLC (MKFM), and its minimum billing increment of 15 minutes were both reasonable. For the reasons stated herein, we affirm.

¶ 2                                   I. BACKGROUND
¶ 3   Nick and Alissa were married on May 25, 1996, and had two children, born in 2002 and 2004. On June 7, 2013, a judgment for dissolution of marriage was entered, which incorporated a marital settlement agreement.
¶ 4   On November 13, 2014, an agreed order was entered, modifying the marital settlement agreement (Agreed Order). Nick's income was based partially on commissions because he worked in sales. Pursuant to the Agreed Order, Nick was to pay 28% of his net income in child support and 30% of his gross income in maintenance. The Agreed Order assumed a base annual gross income of $150,000 and set forth fixed monthly payments for both child support and maintenance, based on that amount. Additionally, each month, Nick was to pay 28% of the net and 30% of the gross of any income that exceeded $12,500 (which represents the monthly gross income for a salary of $150,000). Effectively, these additional payments would true-up to the 28% net and 30% gross owed for child support and maintenance. Nick was also to submit copies of his paystubs to Alissa each month. In practice, the base payments were withheld from Nick's pay automatically, whereas the additional payments were made by Nick to the Illinois State Disbursement Unit. Maintenance was capped at a gross income of $250,000 and child support was capped at a gross income of $375,000. Per the terms of the Agreed Order, maintenance would terminate upon one of the following events: "a. Wife's remarriage; b. Wife's cohabitation; c. Wife's death; d. Husband's death; or e. Sixty-Eight (68) months unless Alissa files a petition for review by June 30, 2020."

## A. Contempt Proceedings

On November 27, 2017, Nick filed a petition seeking to terminate maintenance, based on Alissa's cohabitation with Larry, and to modify child support. At that time, Nick stopped making the additional maintenance and child support payments provided by the Agreed Order; however, the base amounts were still being automatically withheld from his pay. On January 4, 2018, Alissa filed a petition for adjudication of indirect civil contempt for Nick's failure to make the required additional maintenance payments. On March 7, 2018, the trial court entered an order on Alissa's petition in which it did not find Nick in contempt but ordered him to pay the past due maintenance amounts within 30 days and to continue to make the required payments consistent with the Agreed Order.

On March 16, 2018, Alissa filed a second contempt petition on the basis that Nick had stopped making the additional child support payments and had also failed to provide Alissa with copies of his paystubs in accordance with the Agreed Order. On March 23, 2018, the trial court ruled on Alissa's second contempt petition, finding that Nick's failures to make child support payments and to provide his paystubs were without reasonable cause or legal justification, but it did not find him in contempt. The trial court allowed Alissa to submit a fee petition against Nick for the costs of bringing the petition. The trial court also set a status date for April 30, 2018, to determine the amount of child support arrearages and determine a payment plan. At that status hearing, the trial court found that Nick was $14,195.40 in arrearage on his child support obligations and ordered him to make monthly payments of $1250 to pay the arrearage. The trial court also reiterated that the terms of the Agreed Order were to remain in full effect.

On April 5, 2018, Nick filed a petition to modify the March 7, 2018, order to allow him more time to repay the past due maintenance. On May 30, 2018, Nick moved to reconsider the April 30, 2018, order. On June 4, 2018, the court entered an order giving Nick until June 29, 2018, to pay the past due maintenance and indicated that it would take the motion to reconsider the April 30, 2018, order with the trial on Nick's petition to terminate maintenance.

On August 6, 2018, while the trial was ongoing, Alissa filed a third contempt petition on the basis that Nick had failed to pay all past due maintenance by June 29, 2018, and had failed to produce his paystubs in compliance with the court's orders. On December 10, 2018, the trial court found Nick in contempt for failure to make maintenance payments and provide Alissa with his paystubs as ordered by the March 7, 2018, and June 4, 2018, orders. The court stated that Nick could purge the contempt if, within 30 days, he paid all past due maintenance and submitted all paystubs not previously provided.

## B. Trial

Prior to trial, on May 20, 2018, Larry was killed in an automobile accident. A trial was held over the course of four days, on June 20 to June 21, 2018, August 23, 2018, and October 5, 2018. Alissa brought two motions *in limine*: the first sought to bar certain evidence produced after the close of discovery and the second sought to bar the testimony of Mark Grena, a private investigator hired by Nick. Regarding the first motion, Alissa argued that Nick had submitted certain discovery documents on May 30, 2018, after the close of discovery on May 29, 2018, and that those documents should be barred. The trial court granted the motion and barred any documents that had not been produced by the close of discovery. This included records from BMO Harris, JP Morgan, CNW Insurance, Glen Oak Country Club, JP Morgan Chase

Securities, and Thomas Giuliano, Alissa and Larry's landlord. We note that, while these documents were barred, Nick's counsel was able to utilize some of the documents for other purposes, such as rebuttal.

¶ 12    With regard to the second motion *in limine*, Alissa argued that Grena could not be called as an expert witness because Nick had failed to provide the opinions to which he would testify and had failed to establish his qualifications as an expert as required by Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018). Additionally, Alissa argued that he should be barred from testifying, because, in the process of gathering information, he had committed various crimes, such as filming Alissa and her children through their home's windows, as well as going through their mail. The trial court ruled that Grena could not testify as an expert but could be called as a fact witness, though the court would admonish him regarding his rights. Grena ultimately was not called.

¶ 13    The following evidence was produced at trial regarding the issue of cohabitation. Alissa testified as follows. She met and befriended Larry in 2013, after her divorce from Nick. They did not begin dating until spring 2016. On October 11, 2016, she and Larry executed a lease for a home at 418 Hill Avenue, Glen Ellyn, and they moved in on November 1, 2016. That home was the primary residence of Alissa, her children, and Larry. After they moved in, Larry had no other residence prior to his death. Larry was listed as an emergency contact for Alissa's daughter. Alissa's children and Larry's daughter had their own rooms at 418 Hill Avenue, and Larry's son would sleep in the guest bedroom when visiting. Alissa and Larry would share a bedroom and had been intimate. However, she and Larry fought often, and, if they were fighting, he would sleep in a different bedroom or leave for a couple nights.

¶ 14    Alissa and Larry hosted several holidays together. In 2016, they hosted Thanksgiving and celebrated Christmas with her children. Alissa and Larry hosted Thanksgiving again in 2017 with some of their friends, Larry's children, and Alissa's aunts and uncles. Alissa and Larry also hosted Christmas Eve in 2017 with their children and Larry's parents from Minnesota.

¶ 15    Alissa and Larry went on several trips together. In April 2017, Alissa, Larry, and their children traveled to South Carolina to visit Alissa's father and stepmother for approximately five days. In May 2017, Alissa and Larry traveled to Mexico. It was a week-long business trip for Larry's company, and she did not recall paying for anything. In the summer of 2017, Alissa, Larry, and their children traveled to Wisconsin, where they spent time boating. Larry paid for that trip. In November 2017, Alissa went to Denver on a business trip, Larry flew out to meet her at the conclusion of her business, and they spent two days in Vail. Larry paid for the Vail portion of the trip. In February 2017, Alissa flew to New York to spend a couple days with Larry while he was there on a business trip. Although they had intended to share a room, they got into a fight and Larry got another room at the opposite end of the hotel. In May 2018, Alissa and Larry spent seven days together in Puerto Vallarta, Mexico, while Larry was there on a business trip. Larry's company paid for that trip. However, although they took many trips together, Alissa and Larry would also take separate vacations with their children.

¶ 16    Evidence was presented that Alissa and Larry comingled their finances. Alissa testified that they shared a BMO Harris bank account from October to December of 2017. Alissa would initially testify that she was added to the account in order to purchase Christmas gifts and then taken off the account at the end of the holiday season; however, she later testified that the reason she was added to the account was so she would not have to use her money to pay for Larry's children's expenses while they were with her. Larry paid the security deposit and rent

for their home. Alissa owned a townhome at 459 Kenilworth Avenue, Glen Ellyn. As of March 2017, there had been two renters staying at 459 Kenilworth Avenue. The leases were in Larry's name, and he handled basically all aspects of the rental process. Alissa could not even recall how much the property was being rented for. From March 2017 through April 2018, Alissa had not made any payments toward the mortgage on the 459 Kenilworth Avenue property. Larry made all of the mortgage payments. Alissa testified that the latest lease had been on a month-to-month basis because things with Larry were not going well and she was seriously considering moving back to the townhome. Alissa and Larry had joint automotive and renter's insurance policies.

¶ 17    For the period spanning roughly from April 2016 to Larry's death, tens of thousands of dollars were transferred between Alissa and Larry. Alissa was evasive when questioned about these transactions and claimed ignorance regarding most of the transactions. Alissa did admit that Larry would pay her back for his country club membership and that she had given Larry $10,000 from her IRA to pay her legal fees. She also admitted that Larry had paid some of her legal fees, but she did not know how much. Alissa testified that, at the time of his death, Larry had been paying her car payment, the utilities at 418 Hill Avenue, and her automotive insurance and cellphone.

¶ 18    Alissa claimed that she and Larry were not engaged. Yet in July 2017, Larry had gifted her a ring. The ring was purchased from Cartier. Alissa first testified that she wore the ring on her left ring finger, though she later testified that she wore it on both hands due to her knuckles swelling. Alissa testified that the ring was not an engagement ring or a solitaire. It was a birthday gift, and Larry had taken her children to help pick it out. She had not told any of her friends or family that she was engaged. Additionally, she had not sold her townhome because she was not certain of her future with Larry, as they fought a lot. She stated that Larry's parents were opposing her claim to Larry's life insurance proceeds, based on their belief that her and Larry's relationship was not legitimate. When asked, she did not recall speaking with the coroner's office regarding Larry's death.

¶ 19    Patricia White testified to the following. She was a deputy coroner in the Du Page County Coroner's Office. She was at work on the date of Larry's death. That same day, she received a phone call from someone identifying herself as Alissa Andres. Alissa asked her if the coroner's office had the body of Larry Eastman. She responded that they had the body of an as of yet unidentified individual. Alissa asked if she could view the body, to which White responded that the office did not do viewings. Alissa identified herself as Larry's fiancée. Alissa then told her that Larry had tattoos of his children's names, but then she began to cry such that she was no longer comprehensible and the conversation ended.

¶ 20    Tom Giuliano testified to the following. He owned the 418 Hill Avenue residence and rented it to Alissa and Larry. Alissa and Larry had not made any representation to him about their relationship, but he assumed them to be boyfriend and girlfriend. The lease was executed on November 1, 2016, and had a 24-month term. Larry paid the security deposit and monthly rent. In April or May 2018, there had been communications about entering into a new lease in order to extend the rental period. Both leases would have had an option to buy. The lease was ultimately not extended, due to Larry's death.

¶ 21    Christa Eastman testified as follows. She had married Larry on September 7, 1996, and divorced him on July 12, 2013. They had two children together. Alissa and Larry started dating around 2012. Alissa and Larry lived together from November 2016 until Larry's death. After

Larry passed, Christa received a notification from insurance company National Life Group. The notification indicated that Alissa was a beneficiary under Larry's life insurance policy, and it listed her as his fiancée.

¶ 22    On December 10, 2018, the trial court issued an order granting Nick's motion to terminate maintenance, effective as of November 27, 2017, the date his petition was filed. The trial court based its decision on the following findings of fact. Alissa and Larry had been in a relationship since 2013, first as friends, then as boyfriend and girlfriend, and finally as fiancées. The trial court found that Alissa and Larry were engaged, based on the evidence that Alissa wore the ring from Larry on her left hand, that she identified herself as Larry's fiancée with the coroner's office, and that Larry listed Alissa as his fiancée on his life insurance policy. The trial court did not find Alissa's testimony to the contrary to be credible. The trial court found that Alissa and Larry spent considerable time together. They lived together, had planned on extending their lease together, ate together, golfed together, and shopped together. The trial court found that Alissa and Larry had decidedly intermingled their personal affairs, emphasizing that they had leased a home together, Larry had managed and leased Alissa's 459 Kenilworth Avenue property, they transferred money to each other on a regular basis, and they were involved in each other's children's activities. The trial court also found that Alissa and Larry regularly vacationed and spent holidays together. Based on this evidence, the trial court found that Alissa and Larry had a *de facto* marriage. The trial court selected November 27, 2017, for the termination of maintenance, noting that pinpointing a date upon which a *de facto* marriage could be said to have begun was difficult to impossible and that therefore all the trial court could conclude was that there was a *de facto* marriage at least by the date of Nick's petition.

¶ 23    The trial court also determined that child support should be modified based upon the termination of maintenance and ordered the parties to calculate child support using the multi-family adjustment as set forth in section 505(a)(3)(F)(I) of the Act (750 ILCS 5/505(a)(3)(F)(I) (West 2018)).

¶ 24                                    C. Post Judgment

¶ 25    On December 18, 2018, Nick filed a motion to clarify the December 10, 2018, order, requesting *inter alia* that the court enter a judgment against Alissa for the reimbursement of maintenance and set forth a plan for how Alissa should repay maintenance. On December 27, 2018, Alissa also filed a motion for clarification requesting that the trial court rule on her pending motion to modify child support, that the court not apply the multi-family adjustment, and that the court order child support in excess of the guidelines. The motions were set for hearing on January 28, 2019. Following the hearing, the trial court entered an order on March 6, 2019, modifying Nick's child support obligations, retroactive to the termination of maintenance. The trial court also determined that Nick was responsible for 97.2% of the children's support and expenses, which likewise applied retroactively to the date maintenance terminated. The trial court then determined that Nick had overpaid his maintenance and support obligations for the period of November 27, 2017, to December 10, 2018, in the amount of $44,625.13.

¶ 26    Alissa filed a second motion for clarification on April 4, 2019, in which she sought *inter alia* a credit against the amount she owed to Nick for past due maintenance. She contended that the credit should reflect the children's expenses she paid from November 27, 2017, to December 10, 2018, of which Nick was retroactively obligated to pay 97.2%. She also

sought a credit for support arrearages from December 10, 2018, stemming from the difference between the trial court's temporary order of withholding and its final order of withholding after it had determined the appropriate amount of support. Additionally, she sought a credit for underpayment of support and maintenance for the period beginning with the entry of the Agreed Order in November 2014 and ending with the termination of maintenance on November 27, 2017. On June 17, 2019, at a status on Alissa's second motion to clarify, the trial court resolved most of the pending issues but continued to a later date the matter of credits owed to Alissa.[1]

¶ 27 On July 29, 2019, August 14, 2019, and September 4, 2019, hearings were held on the amount of credits owed to Alissa. On July 29, 2019, by consensus, the trial court found that Nick owed Alissa credits for back child support in the amounts of $3542.05 for the insufficient withholdings and $5293.44 for excess income earned in 2018. On August 14, 2019, the trial court determined that Nick owed Alissa credits in the amount of $15,323.93 for the children's expenses arising after the termination of maintenance.

¶ 28 At the September 4, 2019, hearing, Alissa argued that Nick had underpaid his maintenance and child support obligations from the effective date of the Agreed Order on November 13, 2014, through the termination of maintenance on November 27, 2017. Alissa utilized a calculation that did not deduct maintenance payments from Nick's net income for the purpose of determining child support. Nick argued that, based on section 505 of the Act, maintenance payments should have been deducted from his net income for the purpose of determining child support and that, according to his calculations, Alissa actually owed him reimbursements for overpayment. The trial court ultimately found in favor of Alissa, and, in an order dated September 12, 2019, determined that Nick owed Alissa $29,608.23 in past due child support and maintenance. On October 3, 2019, Nick filed a motion to reconsider the trial court's order of September 12, 2019.

¶ 29                                      D. Attorney Fees

¶ 30 On May 3, 2019, MKFM moved to withdraw as Nick's attorney of record. On May 8, 2019, the trial court granted MKFM's motion to withdraw and granted it leave to file a petition for fees. MKFM filed its petition for setting final attorney fees and costs against Nick on June 4, 2019. A hearing on the fee petition was held on August 28, 2019.

¶ 31 At that hearing, Nick testified to the following. In October 2017, Nick approached MKFM regarding legal representation, and he entered into a written agreement with MKFM on November 6, 2017 (Engagement Agreement). At the time he entered into the Engagement Agreement, he read it and believed that he understood its terms. The Engagement Agreement contained the following provision regarding minimum billing:

> "All telephone calls, voicemails, emails, correspondences and other activities, including travel, will be billed in increments of one quarter (¼) hour's time. All court appearances will be billed at a minimum of one (1) hour's time. In the event a court appearance exceeds one (1) hour's time, such appearance will be billed in increments of one quarter (¼) hour's time thereafter. The preparation of any court document will be billed at a minimum of one (1) hour's time. In the event that the preparation of a

_____

[1]From this point onward Nick proceeded *pro se*. He was, however, represented by counsel in the proceedings related to MKFM's fee petition and on appeal.

court document exceeds one (1) hour's time, such preparation will be billed in increments of one quarter (¼) hour's time thereafter."

¶ 32    After Nick signed the Engagement Agreement, Lindsay Stella was assigned to handle his case and became his primary contact at the firm. When Nick engaged MKFM, he wanted it to file a petition to terminate his maintenance obligations to Alissa and to modify his child support obligations in accordance with new laws, particularly the multi-family adjustment.

¶ 33    He received monthly bills from MKFM. At no time did he object to the amount of time billed or submit any inquiries regarding the nature of the charges. He made monthly payments toward the billed amounts until February 2019. He was aware that the Engagement Agreement allowed for periodic increases of the firm's hourly rates, and, in January 2019, he received a letter advising him that the hourly rates would be increasing. He was active in his case and tried to provide MKFM with information to help with the litigation. Nick agreed that the trial court had granted his petition for termination of maintenance and modification of child support using the multi-family adjustment. He likewise agreed that, in doing so, MKFM had obtained the results he wanted from his initial petition, though he considered it to be only a partial success, since he was now paying more in child support than he had previously.

¶ 34    Despite not submitting a formal objection to the amount he was being billed, Nick did express some concerns regarding his representation. On April 23, 2018, he wrote to Stella, asking if she thought it would help to have another partner come in to work on the case. Stella responded that she would be open to that possibility. Later in June 2018, Stella suggested bringing in Joshua Bedwell to take Nick's trial testimony so that she could focus on preparing to examine Alissa. Nick did not object to bringing on Bedwell. After receiving a fee petition from Alissa, Nick raised concerns with Stella regarding the fact that Alissa's counsel had billed only 197 hours compared to Stella's 430 hours.

¶ 35    After the second day of trial, Nick expressed concern to Stella regarding the fact that his evidence had been barred through what he felt was a mistake by the firm. Stella responded that the trial court had made a bad ruling and that the firm would take care of it. He also expressed concerns that, as a result of the evidence not being admitted, the trial was taking longer than it should have.

¶ 36    At the hearing, Stella testified to the following. Regarding the case as a whole, it involved a lot of discovery, and getting that discovery from Alissa was not easy, as Alissa's counsel aggressively defended the case.

¶ 37    With regard to billing, the firm utilized a computer program called "Tabs." Stella would make near contemporaneous entries into the program for the time she billed. This would involve selecting the case file, entering the amount of time to be billed, entering a description of the work, and selecting whether the work was in court or out of court. There was a one hour minimum billing increment for the preparation of a court document, so the paralegals would bill one hour for the preparation of a subpoena even if it took only five minutes. Likewise, there was a 15-minute minimum billing increment for all general activities, and she would bill 15 minutes for reviewing a document even if it took only one minute. However, she testified, Nick was a very hands-on client and emailed her often, but she did not always bill for responding to those emails. At the end of each month, the bills were finalized and reviewed by the attorneys for accuracy. In 2017, her fees were $300 per hour. In 2018, they increased to $350 per hour, and in 2019, they increased again to $375 per hour for noncourt time and $400 for court time.

¶ 38    With regard to the barred evidence, Stella testified that she had utilized the documents to prepare for the case and that she was still able to utilize the documents for impeachment purposes.

¶ 39    Closing arguments were held on August 29, 2019. In closing, Nick placed special emphasis on the unreasonableness of the minimum billing increments and the total amount of time billed. On September 9, 2019, the trial court entered an order awarding MKFM $95,839.67 for fees. The trial court found that Nick and MKFM had entered into a valid contract, the rates of that initial contract were reasonable and customary, the 15-minute minimum billing increment was reasonable and agreed to, and the January 4, 2019, rate increase was also reasonable. The trial court found that Nick had been provided with monthly billing statements and had not objected. Nick had also agreed to have a second attorney assist on the trial. Further, upon review, the court found that 30 hours of the total billed for trial and deposition preparation—20 hours by Stella and 10 hours by Bedwell—were unreasonable and declined to award those fees. On October 8, 2019, Nick filed a motion to reconsider the trial court order awarding attorney fees.

¶ 40    Both of Nick's motions to reconsider were heard and denied on December 3, 2019. Alissa's counsel withdrew from representation on December 16, 2019. Nick timely appealed.

¶ 41                                    II. ANALYSIS

¶ 42    Nick raises four primary issues on appeal. He argues that the trial court erred when it determined that Alissa and Larry's cohabitation began on November 27, 2017, when it found him in contempt, when it did not deduct maintenance payments from his net income for the purpose of determining past due child support, and when it awarded attorney fees in favor of MKFM. MKFM is the appellee in the matter of attorney fees, and Alissa is the appellee on the other issues.

¶ 43    As a preliminary matter, Alissa has not submitted an appellee's brief. In the absence of an appellee's brief, a reviewing court has three discretionary options it may exercise:

> "(1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of the appellee's brief, or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record." *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009) (citing *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976)).

Based on our reading of the record, the issues directed against Alissa can be decided without the aid of an appellee's brief.

¶ 44                                A. Date of Cohabitation

¶ 45    Nick argues that the trial court erred when it terminated Nick's maintenance obligation as of November 27, 2017, when he filed his petition for termination of maintenance. He argues that instead maintenance should have been terminated as of November 1, 2016, when Alissa began cohabiting with Larry. Alternatively, he argues that the trial court erred when it failed to enforce the terms of the parties' Agreed Order, which required only cohabitation and not cohabitation on a continuing conjugal basis.

¶ 46    Section 510(c) of the Act provides that "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2018). "The rationale behind termination of maintenance when resident, continuing, conjugal cohabitation exists is the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it, with the result that he or she can continue to receive maintenance." *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). The burden is on the party seeking the termination of maintenance to prove that the ex-spouse receiving maintenance is involved in a *de facto* marriage. *In re Marriage of Susan*, 367 Ill. App. 3d 926, 929 (2006). In determining whether petitioners have met their burden, courts look at the totality of the circumstances, and "just as no two relationships are alike, no two cases are alike." *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40. A nonexhaustive list of factors courts consider includes: (1) the length of the relationship, (2) the amount of time spent together, (3) the nature of activities engaged in, (4) the interrelation of personal affairs (including finances), (5) whether they vacation together, and (6) whether they spend holidays together. *Id.* We will not disturb the trial court's finding of a *de facto* marriage unless that finding is contrary to the manifest weight of the evidence. *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 26. A finding is against the manifest weight of the evidence when " 'the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence.' " *Id.* (quoting *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40).

¶ 47    After considering the evidence, the trial court found that Alissa and Larry had a "continuously evolving relationship" and that, "[s]ince no vows were exchanged[,] to pinpoint a date becomes difficult to impossible." It ultimately found that Alissa and Larry's *de facto* marriage began on November 27, 2017, the date Nick's petition was filed.

¶ 48    Nick argues that, based on the trial court's statements, it can be inferred that the trial court was trying to pinpoint a ceremonial event to determine when the relationship became a *de facto* marriage, which is contrary to the requirements of section 510(c). We disagree. The trial court was not trying to pinpoint a ceremonial event but rather was emphasizing that, given the unique nature of Alissa and Larry's relationship, it was difficult to identify a specific point at which their relationship became a *de facto* marriage. In essence, the trial court's finding was that a *de facto* marriage existed at least as early as the filing of the petition.

¶ 49    Nick further questions how the trial court reached its decision regarding the cohabitation date, arguing that the evidence that it used to support the November 27, 2017, date supported a finding of a *de facto* marriage prior to November 27, 2017. Indeed, most of Nick's argument on this point is focused on how the evidence could support his proposed November 1, 2016, date. However, this somewhat misses the point. Merely demonstrating that the evidence reasonably supports a different outcome does not demonstrate that the trial court's decision was against the manifest weight of the evidence. *In re Shirley M.*, 368 Ill. App. 3d 1187, 1194 (2006) (absent a showing that the trial court's decision was against the manifest weight of the evidence, a reviewing court will not set aside the decision, even if the reviewing court would have ruled differently). Nick presents no basis for why the trial court's decision was unreasonable, other than arguing that November 1, 2016, is a more reasonable date.

¶ 50    Further, there is little evidence in the record that supports a finding that cohabitation began on November 1, 2016. Most of the evidence of cohabitation arises after Alissa and Larry moved in together. Most of their vacations and trips together, the lease of Alissa's townhome, the gift

of the ring, and most of the holidays spent together occurred after they moved in together, and most of the intermingling of funds occurred after 2016. Additionally, although the trial court did not find Alissa's testimony to be entirely credible, she did testify that, while she and Larry had been friends since 2013, they began dating only in spring 2016. So, the evidence shows that, as of November 1, 2016, Alissa and Larry had been dating for less than a year, had just moved into a home together, and Larry had written 10 checks to Alissa for a total of $8658. Under these facts, it was not against the manifest weight of the evidence for the trial court to find that a *de facto* marriage had not yet been established.

¶ 51    Turning to Nick's alternative argument regarding the language of the Agreed Order, it lists "Wife's Cohabitation" as a termination event upon which Nick's obligation to pay Alissa maintenance would terminate. Nick maintains that the terms of the Agreed Order set forth a different standard (*i.e.*, mere cohabitation) than those set forth in section 510(c), which states that maintenance terminates when "the party receiving maintenance cohabits with another person on a resident, continuing, conjugal basis." 750 ILCS 5/510(c) (West 2018). "Marital settlement agreements are contracts and, therefore, the rules governing the interpretation of contracts apply." *In re Marriage of Lyman*, 2015 IL App (1st) 132832, ¶ 71. The primary objective of contract construction is to give effect to the intent of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33, (2007). The best indication of the parties' intent is a contract's language. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007). If a contract's language is unambiguous, it should be given its plain and ordinary meaning. *Id.* "The interpretation of a marital settlement agreement is reviewed *de novo* as a question of law." *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009).

¶ 52    Nick argues that, under the terms of the Agreed Order, Larry and Alissa began cohabiting on November 1, 2016, when they began living together. We disagree. While Nick argues that the plain meaning of cohabit means merely to live together, even the ordinary meaning of the word implies a marriage-like state of being. Merriam-Webster's dictionary defines "cohabit" as "to live together as or as if a married couple." Merriam Webster's Collegiate Dictionary 241 (11th ed. 2020). *Contra In re Marriage of Gray*, 314 Ill. App. 3d 249, 253 (2000) (suggesting a distinction between mere cohabitation and cohabitation on a resident, continuing, and conjugal basis, though that notion is not expanded upon). Accordingly, we reject Nick's alternative argument.

¶ 53                                B. Contempt

¶ 54    "Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). Indirect contempt occurs outside the presence of the court, and proof of willful disobedience of a court order is essential to any finding of indirect civil contempt. *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17.

> "The burden initially falls on the petitioner to establish, by a preponderance of the evidence, that the alleged contemnor has violated a court order. [Citation.] Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order." *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50.

"Whether a party is guilty of contempt is a question of fact for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion" *In re Marriage of Tatham*, 293 Ill. App. 3d 471, 480 (1997).

¶ 55    Nick argues that his obligation to pay maintenance automatically terminated upon Alissa's cohabitation with Larry, pursuant to section 510(c) of the Act and the Agreed Order, and that therefore he had a legal justification to stop making maintenance payments to Alissa. Accordingly, he maintains that the trial court erred in finding him in contempt in its December 10, 2018, order, and in support he cites this court's decision in *Gray*, 314 Ill. App. 3d 249 (2000).[2] We disagree.

¶ 56    The December 10, 2018, order held Nick in contempt for his failure to pay past due maintenance per the trial court's March 7, 2018, and June 4, 2018, orders and for his failure to provide his monthly paystubs as required by the Agreed Order. The March 7, 2018, order addressed a previous contempt petition filed by Alissa, for Nick's failure to pay maintenance for the months of November and December 2017. In response to that petition, Nick argued, as he does now, that, under section 510(c) of the Act and the Agreed Order, he was no longer obligated to pay maintenance. The trial court rejected this argument and ordered Nick to continue to pay maintenance as he had previously been doing and to pay the past due maintenance. The June 4, 2018, order extended the deadline to pay the past due maintenance.

¶ 57    Regardless of whether Nick's obligation to continue to make maintenance payments terminated upon Alissa's cohabitation with Larry or upon the trial court's adjudication of Nick's petition, the trial court had considered Nick's arguments and ordered that he continue to make maintenance payments, yet he failed to do so.

> "One is justified in refusing to comply with a court order only if such order is utterly void, but it is no defense in a contempt proceeding to show that the order was merely erroneous. [Citations.] If the court had jurisdiction of the subject matter and of the parties to the proceeding, then its order must be obeyed until such time as it is set aside by the issuing or reviewing court." *Faris v. Faris*, 35 Ill. 2d 305, 309 (1966).

"A litigant's disagreement with the court's decision does not excuse the litigant from the obligation to obey it." *In re Estate of Steinfeld*, 158 Ill. 2d 1, 19 (1994). Where an order for dissolution of marriage has been entered, the trial court retains jurisdiction to enforce its order. *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 297-98 (2000). Here, there is no doubt that the trial court retained jurisdiction to enforce the parties' Agreed Order. As such, it is irrelevant whether the trial court erred when it ordered that Nick was still obligated

---

[2]While we do not reach the issue here, we note that *Gray* examined a previous version of section 510(c), which was subsequently amended to include the following language: "A payor's obligation to pay maintenance or unallocated maintenance terminates by operation of law on the date the recipient remarries or *the date the court finds cohabitation began*. The payor is entitled to reimbursement for all maintenance paid from that date forward." (Emphasis added.) 750 ILCS 5/510(c) (West 2016). Additionally, while the terms of a marriage settlement agreement may sometimes allow a payor spouse to terminate maintenance payments upon the payee spouse's cohabitation without prior leave of court, this course of action is inadvisable. The issue of cohabitation is often a contested issue of fact, and the decision to stop making payments may lead to contempt proceedings against the payor spouse (as was the case here).

to make maintenance payments, since that error would not justify Nick's failure to make payments pursuant to the March 7, 2018, and June 4, 2018, orders.

¶ 58     Additionally, regardless of whether Nick was still obligated to make maintenance payments after Alissa's cohabitation, under the terms of the Agreed Order, Nick was obligated to produce his paystubs as part of his child support obligations. As such, Nick's failure to produce the paystubs was without justification and therefore also a basis for contempt. Accordingly, we do not find that the trial court erred when it found Nick in contempt.

¶ 59                              C. Past Due Child Support Obligations

¶ 60     Nick maintains that the trial court erred in entering a judgment against him for past due child support from November 1, 2014, through November 27, 2017. He argues that Alissa first raised the issue of Nick underpaying child support for that period in her April 4, 2019, second motion for clarification and that the previous petitions for rule to show cause did not address this issue. Nick maintains that the portion of Alissa's motion addressing child support owed for the period of November 1, 2014, through November 27, 2017, constitutes a new cause of action, which cannot be brought as a postjudgment motion under section 2-1203 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1203 (West 2018)). Nick maintains that section 2-616(a) of the Code governs such motions and stipulates that a new cause of action must be added before a final judgment is entered. *Id.* § 2-616(a). Citing section 510(a) of the Act, Nick goes on to argue that, even if we were to consider the motion as a modification of the Agreed Order, such a modification cannot be applied retroactively. Nick further argues that, even if this court deems that a modification of the Agreed Order was permissible, the trial court failed to deduct his maintenance payments from his net income for the purpose of determining child support in accordance with section 505 of the Act.

¶ 61     It is the substance of a motion, rather than its title, that determines its character. *In re Marriage of Hall*, 404 Ill. App. 3d 160, 165-66 (2010). In her second motion for clarification, Alissa argued that, from November 2014 through November 27, 2017, Nick failed to pay the full amount of maintenance and child support owed to her under the Agreed Order and that therefore she was entitled to a credit against the amount she owed to Nick as reimbursement for maintenance. Because the motion sought not to impose new or different obligations on the parties but rather to enforce the rights and obligations that already existed, it is properly characterized as a motion to enforce the prior Agreed Order, rather than a modification or a new cause of action. See *id.*; *In re Marriage of Allen*, 343 Ill. App. 3d 410, 412-13 (2003). "Where a domestic relations order has been entered, the trial court retains jurisdiction to enforce its order [citation], as further performance by the parties is often contemplated [citation]." *Smithberg*, 192 Ill. 2d at 297-98. Accordingly, the trial court had jurisdiction to consider the issue.

¶ 62     We now turn to the issue of whether the trial court should have deducted Nick's maintenance payments from his net income for the purpose of determining the amount of child support owed from November 2014 through November 27, 2017. At the time the Agreed Order was entered, section 505 of the Act did not provide any reduction to gross income for maintenance payments owed to the ex-spouse. 750 ILCS 5/505 (West 2012). Effective January 1, 2015, section 505 did include such a reduction. Pub. Act 98-961 (eff. Jan. 1, 2015) (amending 750 ILCS 5/505(a)(3)); see also 750 ILCS 5/505(a)(3)(F)(II) (West 2018). With regard to whether this reduction should have been applied to the proceedings, we must look to

section 801 of the Act, which governs the applicability of the Act. 750 ILCS 5/801 (West 2018). Section 801 in relevant part states:

"(a) This Act applies to all proceedings commenced on or after its effective date.

(b) This Act applies to all pending actions and proceedings commenced prior to its effective date with respect to issues on which a judgment has not been entered. Evidence adduced after the effective date of this Act shall be in compliance with this Act.

(c) This Act applies to all proceedings commenced after its effective date for the modification of a judgment or order entered prior to the effective date of this Act." *Id.*

As we have discussed, the relief sought was not a modification, so subsection (c) does not apply. The April 2019 motion that sought to enforce the Agreed Order was not pending prior to the Act's passage, so subsection (b) does not apply. Thus, the question becomes whether Alissa's motion to enforce is considered a proceeding commenced on or after the effective date of the Act.

¶ 63    The construction of a statute is a question of law and is reviewed *de novo*. *Sperl v. Henry*, 2018 IL 123132, ¶ 23. The primary goal of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill. 2d 315, 319 (2010). The best indication of the legislature's intent is the plain language of the statute itself. *Id.* In determining the plain meaning of statutory language, the court looks to the statute as a whole, the subject it addresses, and the apparent intent of the legislature. *People v. Perry*, 224 Ill. 2d 312, 323 (2007). Where the statutory language is clear and unambiguous, it must be applied without resorting to additional tools of statutory interpretation. *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 74. "A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways." *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 395-96 (2003). The phrase, "all proceedings commenced on or after its effective date," is ambiguous because it is capable of more than one reasonable interpretation. It could be read broadly so as to apply, *e.g.*, to any motion, petition, or claim filed on or after the effective date of the Act, or it could be read more narrowly to apply, *e.g.*, only to new claims or causes of actions.

¶ 64    "No sentence, clause, or word should be interpreted in a way that renders it superfluous or meaningless. [Citations.] If two interpretations are possible, the one that gives all words in the statute some meaning will be the one that is more reasonable." *McTigue v. Personnel Board of the City of Chicago*, 299 Ill. App. 3d 579, 589 (1998). Interpreting section 801(a) as applying broadly to all motions, petitions, or claims would render section 801(c) meaningless, since motions to modify would already be included in section 801(a). As such, it is evident that the legislature intended not for 801(a) to apply to all motions, petitions, or claims filed after the effective date of the Act but instead to some narrower subset.

¶ 65    For the purposes of this appeal, we need consider only whether Alissa's motion to enforce constituted a new proceeding for the purposes of section 801(a). "The policies underlying a statute are often regarded as a valuable source of legislative intent." *Harvel v. City of Johnston City*, 146 Ill. 2d 277, 283 (1992). "In determining what that intent is, the court may properly consider not only the language used in a statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." *Stewart v. Industrial Comm'n*, 115 Ill. 2d 337, 341 (1987). Upon consideration, we conclude that the legislature has demonstrated a clear policy against relitigation of previously decided matters and against the

- 14 -

disruption of prior judgments in matters of maintenance and child support. This policy is evinced in section 801(b), which limits the application of the new Act to pending matters "with respect to issues on which a judgment has not been entered." 750 ILCS 5/801(b) (West 2018).

¶ 66    As further evidence of this policy, shortly after the effective date of section 801, January 1, 2016, section 505 of the Act was amended, changing the guideline calculations for child support from a percentage system to an income share system. See Pub. Act 99-764 (eff. July 1, 2017) (amending 750 ILCS 5/505, 510). Simultaneously, section 510 of that Act was amended to clarify that while an order entered prior to the amendment of section 505 could be modified to apply the new income share system, this could only be done upon a finding of a substantial change in circumstances, and that the amendment itself did not constitute such a change in circumstances. *Id.* "Courts presume that the legislature envisions a consistent body of law when it enacts new legislation." *Lily Lake Road Defenders v. County of McHenry*, 156 Ill. 2d 1, 9 (1993). The legislature's decision to exclude the change in law as a substantial change in circumstances warranting modification of support further demonstrates a consistent policy of not disturbing support judgments once they have been entered.

¶ 67    Additionally, regarding the substantially similar 1977 version of section 801, our supreme court explained, " 'It is not this section's intent to require the relitigation of issues already decided under the previous law simply because post-trial motions are pending or filed after the effective date of the new act.' " *West v. West*, 76 Ill. 2d 226, 234 (1979) (quoting *Staub v. Staub*, 67 Ill. App. 3d 1004, 1007 (1978)). It is presumed that the legislature is aware of the construction a statute has been given, and, by re-enacting that statute without modification, the legislature is presumed to have intended that the new statute have the same effect. *Williams v. Crickman*, 81 Ill. 2d 105, 111 (1980).

¶ 68    Because Alissa's motion to enforce sought to enforce only the terms of the existing Agreed Order, it was not a new proceeding for the purposes of section 801(a) but, rather, a continuation of the dissolution proceedings, in which a judgment had already been entered. Accordingly, the trial court did not err when it did not deduct Nick's maintenance payments from his net income for the purpose of determining the amount of child support owed to Alissa.

¶ 69    Nick also argues that the trial court erred in entering as a judgment the amounts he owed to Alissa but not doing so for the amounts it determined Alissa owed to Nick, allowing Alissa to initiate third-party citation proceedings against Nick. In support of this argument, Nick cites no case law nor provides any standard of review. "A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented." *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). Additionally, the last item in the record regarding these citation proceedings indicates that Nick had filed an emergency motion to reconsider, which was awaiting a hearing. It is unclear whether these proceedings are ongoing or concluded. Accordingly, we will not address this argument.

¶ 70                                         D. Attorney Fees

¶ 71    As a preliminary matter, MKFM argues that Nick raises for the first time on appeal the argument that MKFM's minimum billing policy violated Illinois Rules of Professional Conduct of 2010 Rule 1.5(a) (eff. Jan. 1, 2010) and that therefore that argument should be deemed forfeited. Additionally, MKFM maintains that Nick's brief fails to comply with Illinois Supreme Court Rule 341 (eff. May 25, 2018). Nick maintains that he did raise the issue before

the trial court and argues that MKFM has included facts in their brief that are not in the record on appeal.

¶ 72 "It is well settled that issues not raised in the trial court are forfeited and may not be raised for the first time on appeal." *Bank of New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 72. While it is true that Nick did raise the topic of the rules of professional conduct before the trial court, he did so in a single passing remark in closing argument that mentioned the rules of professional conduct broadly without reference to any particular rule or section.

> "The purpose of this court's forfeiture rules is to encourage parties to raise issues in the trial court, thus ensuring both that the trial court is given an opportunity to correct any errors prior to appeal and that a party does not obtain a reversal through his or her own inaction." *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14.

Nick's argument was not sufficiently developed to allow the trial court to consider the issue, and, accordingly, we deem that Nick forfeited the issue of whether MKFM's minimum billing policy violated the rules of professional conduct.

¶ 73 As to Nick's brief, while citations to further authority would be welcome, we do not find that Nick's brief violated Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018), particularly since it appears that there is little case law on the subject of reasonable billing increments.

¶ 74 With regard to MKFM's brief, MKFM does cite facts not contained within the record on appeal. In particular, the record does not support MKFM's assertion that it worked on Nick's case to the exclusion of working on cases for other paying clients. As such, any matters not contained within the record will be disregarded. See *Cottrill v. Russell*, 253 Ill. App. 3d 934, 938-39 (1993).

¶ 75 Nick argues that the trial court erred when it granted MKFM's fee petition in the amount of $95,839.67. Section 508(a) of the Act (750 ILCS 5/508(a) (West 2018)) allows the trial court in a dissolution action to order any party to pay a reasonable amount for his or her or the other party's costs and attorney fees. Section 508(c) of the Act governs the award of attorney fees and costs against an attorney's own client. *Id.* § 508(c). Section 508(c)(2) of the Act requires that counsel and client have "entered into a written engagement agreement at the time the client retained the counsel (or reasonably soon thereafter)." *Id.* § 508(c)(2)(i).

¶ 76 The award of attorney fees is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *In re Marriage of Bussey*, 108 Ill. 2d 286, 299 (1985). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41. In determining the reasonableness of fees,

> "[t]he court shall first consider the written engagement agreement and, if the court finds that the former client and the filing counsel, pursuant to their written engagement agreement, entered into a contract which meets applicable requirements of court rules and addresses all material terms, then the contract shall be enforceable in accordance with its terms, subject to the further requirements of this subdivision (c)(3). Before ordering enforcement, however, the court shall consider the performance pursuant to the contract." 750 ILCS 5/508(c)(3) (West 2018).

¶ 77     "Whether a contract exists, its terms and the intent of the parties are questions of fact to be determined by the trier of fact." *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 205 (2007). The trial court's findings of fact will not be disturbed unless they are against the manifest weight of the evidence. *People v. 1945 North 31st Street*, 217 Ill. 2d 481, 507 (2005). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 78     Nick argues that the trial court erred in finding that the Engagement Agreement was a valid contract because the minimum billing increments violate section 508(c) of the Act. Nick acknowledged that he signed the Engagement Agreement, and that at the time he signed it, he understood the terms of the agreement. The Engagement Agreement itself does not appear to be missing any key terms. Apart from the minimum billing increments, Nick does not argue that the contract was in any way deficient. Further, Nick does not cite any case law holding that 15-minute minimum billing increments are inherently unreasonable or render a contract unenforceable. In fact, Nick acknowledges in his brief that "[t]he fifteen minute minimum unit is not presumptively unreasonable, it depends on its application." Accordingly, we find no reason to reverse the trial court's finding that the Engagement Agreement was a valid contract.

¶ 79     We now turn to the reasonableness of MKFM's fees. In determining whether the fees charged are reasonable, the trial court should consider (1) the number of hours the attorney spent, (2) the skill and standing of the attorneys, (3) the difficulty of the issues, (4) the amount and importance of the subject matter in the field of family law, (5) the degree of responsibility involved in the management of the case, (6) the usual and customary charge in the community, and (7) the benefits to the client. *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 103. "The burden of proof is on the attorney seeking the fees to establish the value of his services." *Id.* ¶ 104.

¶ 80     Nick's primary basis for claiming that MKFM's fees were unreasonable stems from MKFM's minimum billing increment. Nick maintains that the minimum billing increments set forth in the Engagement Agreement lead to overbilling; that the evidence established that it was MKFM's practice to round up to either its 15-minute or its hour minimum billing increment, even when the billed task took only a short amount of time; and that MKFM presented no evidence that it ever rounded down in its billing or otherwise took steps to ensure that the fees it was billing were reasonable. Nick also points to nine different dates on which he was billed for between 11 and 27.75 hours as evidence of overbilling. MKFM maintains that the evidence demonstrated that Stella did not always bill Nick for smaller tasks, particularly reading and responding to emails, and that she also reviewed each month's billing summary before the bill was sent to Nick.

¶ 81     In support of his arguments, Nick cites *Luciano v. Sullivan*, No. 84 C 10324, 1990 WL 207375, at *1 (N.D. Ill. Dec. 7, 1990). In *Luciano*, the Northern District of Illinois considered whether it was reasonable for an attorney to utilize a 15-minute minimum billing increment. *Id.* The *Luciano* court held that, while such a large minimum billing increment meant that the time billed for small tasks would necessarily be rounded up and overbilled, the billing increment was reasonable because there were instances where counsel likely rounded down. *Id.* "It is well settled that federal decisions are not binding on Illinois state courts. [Citation.] Despite the nonbinding nature of federal decisions, they can be considered to be persuasive

authority, and they may be followed if the state court believes the federal analysis to be reasonable and logical." *Werderman v. Liberty Ventures, LLC*, 368 Ill. App. 3d 78, 84 (2006). We agree with the Northern District and Nick's assessment that, the larger the minimum billing increment, the greater the likelihood that overbilling will occur. While there is obviously some point at which the size of a billing increment is so high as to render it inherently unreasonable, it was not an abuse of discretion on the part of the trial court to find the billing increments to be reasonable in this case.

¶ 82        As in *Luciano*, here there were balancing factors that in some way mitigated any overbilling that occurred, such as Stella's practice of not billing for certain smaller items like responding to emails. Attorneys have a fair amount of discretion regarding how they bill their clients and what they bill for. Evidence that an attorney exercised restraint and discretion in his or her billing speaks to the reasonableness of the fees, but it is not necessarily required.

¶ 83        As to the specific instances of overbilling presented by Nick, while there were some days where more than a typical workday of eight hours' time was billed, that does not necessitate a finding by the trial court that the amount of time billed was unreasonable. It is an unfortunate truth of the profession that attorneys often have to put in more than eight hours of work in a single day. There are deadlines that must be met, and meeting those deadlines sometimes requires burning the midnight oil. Additionally, for many of the dates identified by Nick, the invoices indicate that more than one person was working on the case.

¶ 84        In addition to his argument regarding the minimum billing increments, Nick raises the following arguments against the reasonableness of MKFM's fees. He argues that the trial court erred in allowing MKFM attorney fees for time spent on discovery of evidence that was ultimately barred by the trial court, due to MKFM's failure to comply with the discovery deadline. At the hearing on the underlying fee petition, Stella testified that, although the evidence was barred, the information gathered from doing the discovery was still useful and that she was able to get most of the information she wanted to get into the record without having to admit the evidence as exhibits. Our review of the record shows that this statement appears to have been true, and ultimately Nick and MKFM prevailed at trial. Accordingly, the trial court could have found those fees to be reasonable despite the evidence being barred.

¶ 85        Nick also argues that the trial court erred when it determined that the reasonable rates for Stella's and Bedwell's fees were $300 per hour and $325 per hour respectively, yet calculated the judgment based on a rate of $350 per hour. This does not accurately characterize the trial court's ruling or process. The trial court found that the initial fees laid out in the Engagement Agreement were reasonable. It likewise found that the 2019 increase in fees was reasonable and, we believe, therefore implicitly found the 2018 increase to likewise be reasonable. Further, the only calculation the trial court made was discounting MKFM's requested fees for certain items that it found unreasonable.

¶ 86        The trial court determined that the amount of time spent in preparation for depositions and trial exceeded what was reasonable by 30 hours: 20 hours by Stella and 10 hours by Bedwell. It then determined the judgment amount by reducing the requested amount of fees by $9250 based on a $300 hourly rate by Stella and a $325 hourly rate by Bedwell.[3] The trial court did

---

[3]It does appear that the trial court applied the wrong hourly rate when it discounted the fees it deemed to be unreasonable, as the deposition and trial preparation took place in 2018, at which time Stella's and Bedwell's hourly rates were each $350 per hour. However, despite raising that argument

not calculate the rest of the judgment based on an hourly rate of $350. Even a cursory examination of the billings would show that a multitude of different rates were billed for the work done by the various attorneys and paralegals. Accordingly, we reject this argument.

¶ 87     After considering Nick's arguments and examining the record, we do not find that the trial court abused its discretion in its award of fees to MKFM. "[T]he trial court that has presided over the divorce case is in the best position to determine whether the attorney fees in question were reasonable and necessary." *Schmidt v. Gaynor*, 2019 IL App (2d) 180426, ¶ 19. Giving appropriate deference to the findings of the trial court, we cannot say that the trial court's fee determination was arbitrary, fanciful, or unreasonable.

¶ 88                              III. CONCLUSION
¶ 89     For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 90     Affirmed.

---

in his motion to reconsider, Nick does not make that argument on appeal. Therefore, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).