2026 IL App (2d) 240319-U
Nos. 2-24-0319 & 2-24-0396 cons.
Order filed February 3, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF MICHAEL K. NUTTER, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 17-D-734 |
| | ) ) | Honorable |
| CRISTIE L. NUTTER, | ) ) | Charles E. Peterson and Keith A. Johnson, |
| Respondent-Appellant. | ) | Judges, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court did not abuse its discretion in ordering sanctions under Illinois Supreme Court Rule 219(c) (eff. July 1, 2002); (2) the trial court did not err in admitting and relying upon the testimony of petitioner's expert witness; (3) the trial court did not commit reversible error in finding a *de facto* marriage by cohabitation; (4) the trial court's determination of the date cohabitation began was not against the manifest weight of the evidence; and (5) the trial court's order that respondent reimburse petitioner $4,610 for attorney fees would not be vacated or reversed.

¶ 2    These consolidated appeals arise out of post dissolution of marriage proceedings involving petitioner, Michael K. Nutter, and respondent, Cristie L. Nutter. In case No. 2-24-0319, respondent appeals from the judgment of the circuit court of Kane County granting petitioner's motion for

discovery sanctions and his motion to terminate maintenance to respondent based on cohabitation. In case No. 2-24-0396, respondent appeals from the judgment of the circuit court granting in part petitioner's motion for attorney fees for prosecuting the discovery violations that resulted in the discovery sanctions. On appeal, respondent argues: (1) the trial court abused its discretion in ordering sanctions under Illinois Supreme Court Rule 219(c) (eff. July 1, 2002); (2) the trial court erred in admitting and relying upon the testimony of a forensic accountant on the issue of cohabitation; (3) the trial court committed reversible error in finding a *de facto* marriage by cohabitation; (4) the trial court's determination of the date cohabitation began is against the manifest weight of the evidence; and (5) the trial court's order that respondent reimburse petitioner $4,610 for attorney fees should be vacated or reversed. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. Dissolution of Marriage

¶ 5      The parties were married on September 21, 1997, and have two (now emancipated) children, Kira and Keenan. Petitioner filed a petition for dissolution of marriage in the circuit court of Kane County on June 6, 2017. Following a contested trial, the court entered a judgment of dissolution of marriage on February 28, 2019. As part of the judgment, the trial court determined that an award of maintenance to respondent was proper. The court set the duration of maintenance at 15 years and 9 months. The initial amount of maintenance was $28,000 per month, but that was reduced by subsequent orders to $15,750 per month. The maintenance award was subject to termination upon certain, articulated events, including cohabitation by respondent on a resident, continuing, conjugal basis. Petitioner appealed from the dissolution judgment. In an order entered on June 18, 2020, this court affirmed the judgment of the trial court. See *In re Marriage of Nutter*, 2020 IL App (2d) 190480-U.

¶ 6                                     B. Motion to Terminate Maintenance

¶ 7     On June 11, 2021, petitioner filed a motion to terminate maintenance. Petitioner alleged that respondent had been "cohabitating with another person ([John] Bradford [Reamer]) on a resident, continuing, and conjugal basis." Petitioner requested that the termination be retroactive to when respondent and Reamer "first engaged in a continuing, conjugal[ ] relationship."

¶ 8                                     C. Discovery Requests

¶ 9     Petitioner subsequently filed a series of discovery requests related to the motion to terminate maintenance. Relevant here, on June 14, 2021, petitioner filed a supplemental request to produce. Among the items requested from respondent in the supplemental request to produce were "[c]opies of any and all social media postings/photos (facebook postings, Instagram posts, etc). [*sic*] showing or depicting or referencing Bradford Reamer" (paragraph one) and "[c]opies of all emails, text messages, letters, social media messages, tweets, etc. between [respondent] and [Reamer]" (paragraph five). On July 30, 2021, respondent answered the supplemental request to produce. Respondent objected to paragraphs one and five as "overly burdensome." On August 19, 2021, petitioner filed a motion to compel answers to the supplemental request to produce, arguing that respondent's objections to paragraphs one and five "do not have a legal basis and [respondent] should be required to answer said requests properly."

¶ 10    On November 2, 2021, petitioner filed a motion for additional discovery-related relief. Among other things, petitioner sought an affidavit from respondent that she had not deleted any social media postings or photos involving her and Reamer after the filing of petitioner's motion to terminate maintenance. Petitioner also sought an affidavit from respondent describing any social media postings or photos that had been deleted. In an order file-stamped on January 6, 2022, the trial court noted that, by agreement, respondent would provide the documentation requested in

paragraph one of the supplemental request to produce within 14 days of entry of the order. In addition, the trial court ordered respondent to provide the court, for an *in camera* inspection, the documentation requested in paragraph five of petitioner's supplemental request to produce, along with a descriptive list. The court also ordered respondent to furnish an affidavit stating whether and what social medial posts or photos she may have deleted.

¶ 11    On January 25, 2022, respondent submitted two affidavits. The first affidavit states that "[a]ll social media photos, posts and photos between myself and *** Reamer have been saved and produced herein before having been deleted off of said platform." The second affidavit stated as follows. Respondent was unable to produce the text messages between herself and Reamer. Respondent "generally" does not save her text messages as she deletes them every few weeks. Respondent deleted "any remaining conversations between [Reamer] and [herself] when [the couple] broke up." Respondent does not back up text messages "to the iCloud" and AT&T, the service carrier during her relationship with Reamer, does not store text message content. In November 2021, respondent changed her cell carrier to T-Mobile and sold her old phone. Respondent purchased software to extract data from back-ups of her phones, but was unable to retrieve any messages between herself and Reamer. Respondent concluded the second affidavit with the following: "I have spent countless hours attempting to comply with the request to produce all text message [*sic*] between [Reamer] and me to no avail."

¶ 12    Petitioner followed up with several more motions, including a motion to compel answers to a second set of interrogatories, an additional motion to compel and for sanctions, a petition for indirect civil contempt and for attorney fees, and an additional petition for indirect civil contempt and for sanctions. In addition, on March 3, 2022, petitioner filed a "Motion for Finding of Subject Matter Waiver and to Compel Production of Attorney-Client Communications" (Motion regarding

Attorney-Client Communications). In that motion, petitioner set forth the proposition that the attorney-client privilege may be waived when a client voluntarily discloses otherwise privileged information to a third party. Petitioner asserted that respondent had waived the attorney-client privilege regarding the subject matter of "cohabitation and/or all issues pertaining to [Reamer]" because, with respect to these topics, she had shared with Reamer communications to and from her attorney. Petitioner requested that respondent therefore produce in discovery all communications with her attorney that relate to Reamer or cohabitation.

¶ 13    In a written order file stamped September 8, 2022, the trial court (Judge Charles Petersen, presiding) ruled on the Motion regarding Attorney-Client Communications. The court determined respondent's voluntary actions in communicating her attorney's emails to Reamer "broke the parameters of the attorney-client privilege relative to cohabitation and relationship issues." The court commented that despite issues of confidentiality, respondent "kept [Reamer] well informed on her attorney's plans and advice." The court thus expressly found the attorney-client privilege waived by respondent on any cohabitation issue involving Reamer. The court ordered respondent "to disclose *** all of the [Reamer] communications" between her and her lawyer concerning her "relationship and cohabitation" with Reamer. Respondent moved to reconsider that order, but the court (Judge Keith A. Johnson, now presiding) denied the motion and ordered respondent to produce the subject communications within seven days.

¶ 14    On April 14, 2023, petitioner filed an emergency motion to compel and for other relief. Petitioner noted that respondent had failed to provide the text messages between herself and Reamer that the court had ordered her to produce. Petitioner further noted that when respondent initially responded to the request for the text messages, she objected on the basis that the request was overly burdensome, thereby admitting that voluminous text messages between herself and

Reamer existed. Yet, she later claimed that the text messages were deleted after she and Reamer broke up (in August 2021), which was two months after petitioner's request to produce was served. Petitioner therefore alleged that respondent deleted the text messages after he specifically sought production of them in June 2021. Petitioner also noted that respondent was ordered to produce social media pictures and posts, but had failed to do so, and now claimed that she had deleted all social media posts related to Reamer. Additionally, petitioner complained about respondent's compliance with the order to produce attorney-client communications. Respondent requested that petitioner be sanctioned for her "unreasonable conduct in the discovery process" and that the court find, *inter alia*, that a presumption has been created that any text messages that respondent deleted were detrimental to her position with respect to cohabitation.

¶ 15    In an order file stamped May 5, 2023 (but dated May 1, 2023), the court set the matter for trial beginning July 10, 2023, on various pleadings, including petitioner's motion to terminate maintenance and petitioner's request for sanctions and for other relief within his "emergency" motion to compel (filed April 14, 2023). With respect to the attorney-client communications, the court ordered respondent to conduct a new, broader term search and send to petitioner within 14 days any additional attorney-client communications. The court also directed respondent to provide a log of text messages between her and Reamer and a log of social media postings related to Reamer, running from January 2018 to the present. Finally, the court reserved ruling on petitioner's request under his "emergency" motion to compel regarding any adverse inferences and sanctions from any missing text messages.

¶ 16    On July 6, 2023, petitioner filed a "motion *in limine* to bar and for other relief" pursuant to Illinois Supreme Court Rule 219 (eff. July 1, 2002). Petitioner alleged that respondent failed to turn over text messages or text message information he had requested in discovery. The allegations

in the motion mirrored the allegations in the April 14, 2023, emergency motion to compel and other relief. Petitioner additionally alleged that respondent changed cell phone carriers and sold her cell phone so that the phone was no longer available and the text messages could not be accessed. Petitioner also asserted some of respondent's social media posts were "purposefully deleted." Petitioner allowed that respondent filed a text message log as ordered by the court, but contended that the log "lacks the specificity and detail the Court ordered" and failed to provide any social media pictures or posts from 2021. Petitioner's motion requested that the court sanction respondent "for her unreasonable conduct in the discovery process," that the court bar her from testifying on her own behalf or in support of any claim or defense, that she be barred from introducing exhibits at trial, that the court order respondent to contribute to petitioner's attorney fees related to the motion, and, that the court find respondent's deletion of text messages and social media postings "creates a presumption that the [deleted text messages and social media material] *** were detrimental to her position with respect to cohabitation."

¶ 17                                      D. Trial

¶ 18    Trial commenced on July 10, 2023, and was conducted over a course of several dates ending on December 7, 2023. When the trial began, the court commented the matter was up for "hearing on a number of petitions that are pending," including the recent motion *in limine* petitioner filed on July 6, 2023.[1]

¶ 19                        1. Hearing on Petitioner's Motion *in Limine*

---

[1]Reamer testified on the initial day of trial. The court stated that it would hear Reamer out of order, finding that this procedure would not "prejudice either side" regarding the motion *in limine*. For ease of reading, however, we initially set forth the facts relating to and the trial court's decision on petitioner's motion *in limine*.

¶ 20 At the hearing on petitioner's motion *in limine*, petitioner called respondent as a witness. Counsel for petitioner questioned respondent about receiving discovery requests, her responses, and the motions to compel. Respondent had objected to some of the written requests as overly burdensome. Respondent was directed to the court's order of January 6, 2022, on petitioner's motion to compel filed August 19, 2021. On January 25, 2022, respondent filed an affidavit in response stating that all saved media posts and photos between herself and Reamer were saved and produced before being deleted off the respective platforms. Respondent could not recall the date the social media posts were deleted but testified that it "appear[ed]" that they were deleted sometime after November 2021. Respondent stated that she deleted the social media posts because she was in a new relationship with someone named "Bart" as of October 2021.

¶ 21 Similarly, respondent stated in an affidavit that all text messages between herself and Reamer had been deleted. Respondent acknowledged that she received the notice to produce documents and therefore knew, as of June 14, 2021, that petitioner, through the discovery process, was asking her to produce text messages between herself and Reamer. She stated, however, that she "does not live [her] life by this case," that she deletes her text messages "regularly every five or six weeks from every text chain that [she has]," and that she deleted the text messages between herself and Reamer when the couple broke up in August 2021. Respondent disputed Reamer's testimony that they broke up in October 2021.[2] Nevertheless, respondent acknowledged that she and Reamer still "had conversations through the month of September," so it was "somewhat accurate" to say that they broke up in October. Respondent added that while she did not produce

---

[2]Recall that Reamer was called out of order prior to the portion of the hearing on petitioner's motion *in limine*.

the actual text messages between herself and Reamer, she did produce what she believes to be "a fair and accurate accounting of what [her and Reamer's] daily text messages would be like."

¶ 22    Respondent further testified that in November 2021, she changed cell phone service providers because, while at home, she was getting bad reception. She also sold her phone in November 2021 because it was "not compatible" with the new carrier. Respondent stated that there was no request for the phone at the time she sold it. Respondent acknowledged that there could have been texts on her phone to indicate when Reamer was coming to her house. Those messages have been deleted. Respondent also deleted text messages between her and Reamer in which the couple expressed their love for each other. According to respondent, the text messages were not ordered produced until January 2022. Up to then, she went about her normal routine, deleting texts every few weeks, "and when [the couple] broke up [she] deleted them altogether" because she did not want to see Reamer's name on her phone. Respondent acknowledged that she did nothing to save any of the text messages between her and Reamer. Moreover, she did not say anything about deleting the text messages until she filed a court-ordered affidavit in January 2022.

¶ 23    On cross-examination by her attorney, respondent described the circumstances of her break up with Reamer in August 2021. She and Reamer had planned a weekend in Chicago to celebrate their birthdays. They had drinks while out with friends, and "[Reamer] had way too much to drink that evening and forgot about [respondent]." Respondent was unable to get back into the couple's hotel room as she did not have the key and her name was not on the reservation. The hotel front desk would not allow her in the room without a key and Reamer did not answer the phone. Unable to reach Reamer, respondent got her own room for the night. The next morning, respondent told Reamer that she could not handle the amount of alcohol he had been consuming and that she was "done." Reamer's alcohol consumption had been an issue "throughout the year, up until that

point." While respondent and Reamer continued to talk after that incident, respondent's intent was simply to "maintain a friendship so that perhaps [she] could get [Reamer] through his issues with alcoholism." As of October 1, 2021, respondent and Reamer had no further communications.

¶ 24    Respondent further testified on cross-examination that she provided a log of the types of text messages she and Reamer traditionally had. According to respondent, on the days she and Reamer were not together, which was typically Monday through Friday, they would touch base in the morning and in the evening to see how the other's day was going. In addition, Reamer would occasionally text respondent when he was traveling to her house. Respondent denied that she was trying to hide anything by deleting her text messages.

¶ 25    On redirect-examination, respondent acknowledged that, after August 2021, she and Reamer communicated by text and email and had dinner or drinks together.

¶ 26    Petitioner testified on direct that respondent and Keenan (petitioner's son with respondent) had the same cell phone carrier and plan in 2021. Petitioner did not experience any cell phone reception problems between him and Keenan in mid-August 2021, when petitioner called Keenan at respondent's home. Petitioner had other conversations with Keenan between April and November 2021. At no time did Keenan indicate to petitioner that there were ever issues with his cell phone at respondent's residence.

¶ 27    Respondent testified in rebuttal that Keenan was not in her home at all during August 2021 as he was away at college in Arizona. He had returned to Arizona on July 28, 2021. Respondent acknowledged that Keenan was at her house at some point between April and November 2021 and that there was a possibility that Keenan spoke with petitioner on his cell phone during that period.

¶ 28    At the conclusion of testimony, the parties orally argued petitioner's request for discovery sanctions. Petitioner's attorney asserted that respondent deleted the text messages purposefully

after the discovery request was made in an attempt to conceal evidence in this case, including how often Reamer was at respondent's residence. Petitioner's attorney urged the court to sanction respondent by drawing the inference that the missing text messages would have been beneficial to his case as to the issue of cohabitation, barring respondent from testifying in support of any claim or defense that she may have at trial, and barring respondent from submitting any exhibits in her case in chief. Respondent's attorney acknowledged that "there was a mistake made with the deletion of the text messages." Respondent's attorney further stated that he understood that "there is probably going to be some form of sanction to [his] client," but argued that the sanction should not be "draconian." The court took the matter under advisement on July 12, 2023, at the end of the third afternoon of the trial.

¶ 29    When the parties reconvened on August 11, 2023, the trial court granted petitioner's motion *in limine*. The court noted that on June 11, 2021, petitioner filed his motion to terminate maintenance based on cohabitation. On June 14, 2021, three days after petitioner filed the motion to terminate, he propounded supplemental requests to produce and supplemental interrogatories upon respondent. Petitioner sought in part copies of social media postings referencing Reamer and copies of all emails, text messages, letters, social media messages, and tweets between respondent and Reamer. As such, respondent knew as of mid-June 2021, that petitioner was asking her to produce text messages and social-media postings. Respondent objected to portions of the request to produce as "overly burdensome." However, the court commented, those objections "did not free up [respondent] to destroy or otherwise fail to preserve the requested evidence. To the contrary, the litigant has an obligation to preserve evidence in ongoing litigation."

¶ 30    The court observed that respondent testified that she and Reamer texted on a consistent basis while dating and that there could have been texts showing when Reamer came over to

respondent's house. Respondent further testified that she deleted text messages between her and Reamer when the couple broke up, even while "knowing about the discovery request," and then sold her phone. Further complicating matters, according to the court, respondent did not say anything about deleting the texts until the affidavit she executed in January 2022. While the court understood that, in ending a relationship, a person may wish to "scrub" messages between him or her and the other person off their phone or Facebook, respondent was aware in this case that text messages and social-media postings were requested in discovery, so she "had an obligation, she had a duty, to preserve" them. Yet, to the best of the court's understanding, respondent had produced "no text messages in this case, zero."

¶ 31    The court then looked to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002). The court found a "serious discovery violation" based on the "numerous, too many to count, text messages" exchanged between respondent and Reamer throughout their relationship. Citing *Palos Community Hospital v. Humana, Inc.*, 2020 IL App (1st) 190633, the court imposed as a sanction the inference that text messages between respondent and Reamer (along with two missing Facebook posts) "would be adverse to [respondent] regarding the issue of cohabitation." Looking further to Rule 219(c)(iv) (Ill. S. Ct. R. 219(c)(iv) (eff. July 1, 2002)), "given the seriousness of this discovery violation," the court ordered respondent barred from testifying concerning the cohabitation issue. The court reserved whether respondent would be barred from presenting any other evidence on the cohabitation issue. Further, the court gave petitioner leave to file "some sort of a motion or petition detailing the attorney time spent and expenses incurred *** chasing after the *** text messages issue." By what is captioned in the record as "Order August 11, 2023" (but file stamped August 31, 2023), the court's oral ruling was reduced to writing. On September 5,

2023, petitioner filed a motion for attorney fees and costs related to respondent's non-compliance with discovery.

¶ 32                    2. Testimony on Petition to Terminate Maintenance

¶ 33    At the trial on the motion to terminate maintenance, petitioner called himself, respondent, Reamer, and Kira to testify. The relevant portions of these witnesses' testimony are discussed in more detail later in this order. Generally, these witnesses' testimony established that respondent and Reamer met in August 2018. During their relationship, the couple maintained separate residences, but Reamer spent most weekends at respondent's home. Respondent indicated that the couple broke up in August 2021. Reamer testified that the couple broke up in October 2021. The remainder of these witnesses' testimony focused on the development and nature of the relationship between respondent and Reamer, the time they spent together alone and with family members and friends (including vacations, holidays, and special occasions), and expenses respondent and Reamer incurred during their time together. Petitioner also called Charles McKenna as a witness. Over respondent's objection, McKenna was certified as an expert in forensic accounting. McKenna reviewed financial records for respondent and Reamer dating back to 2018, including bank statements, credit card statements, and tax returns. He authored a report of his findings dated March 28, 2023, titled "Forensic Accounting Analysis." McKenna also received, reviewed, and relied upon social media postings in preparing his report. McKenna's report was admitted without objection. In his report, McKenna opined that, based on the evidence from his analysis, "there is [a] clear indication that [respondent] and [Reamer] were 'dwelling together' " during their relationship. Relevant portions of McKenna's testimony are also discussed in more detail later in this order. Following McKenna's testimony, petitioner rested. Respondent called petitioner to

testify. Petitioner testified as to his observations regarding the time Reamer spent at respondent's home. Following petitioner's testimony, respondent rested.

¶ 34    During the trial, the court also heard argument on petitioner's motion for discovery sanctions and attorney fees filed September 5, 2023. The court took the motion under advisement.

¶ 35    On March 25, 2024, the parties appeared for the ruling on petitioner's motion to terminate. Citing *In re Marriage of Miller*, 2015 IL App (2d) 140530, the court noted that in addressing the issue of cohabitation, a court looks to the totality of the circumstances considering six non-exhaustive factors to find a *de facto* marriage. The court noted that the factors are not a "checklist." Rather, a court must weigh the seriousness or magnitude of a given factor and look for "signs of mutual commitment and permanence."

¶ 36    Examining the first of the six factors, the length of the relationship, the court found that the evidence showed that respondent and Reamer were in an "exclusive, monogamous, dating relationship that was sexual in nature" from August 2018 to October 2021, or for approximately three years and two months. The court further found that respondent and Reamer expressed their love towards each other "frequently, including publicly on social media." The court noted that the seriousness of the relationship was demonstrated by communications between respondent and her attorney, during which respondent inquired about the law on cohabitation, noted that she and Reamer were taking precautions and modifying their schedules to avoid a finding of cohabitation even though it felt to her like a "big step backwards" in their relationship, and expressed an interest in negotiating with petitioner a reduction in the duration of maintenance in exchange for marriage and cohabitation with Reamer. Reamer also noted in an email to his mother that he and respondent hoped to be married some day. Further, Kira heard Reamer say on more than one occasion that he

wanted to marry respondent. The court concluded that respondent and Reamer "had a deep, committed relationship during which marriage was contemplated."

¶ 37    The court next looked to the second factor, the amount of time spent together. The court recognized that the evidence showed that Reamer kept a separate residence. And while respondent had a key to Reamer's place, the evidence indicated that she was rarely there and that she never spent the night there. The evidence further established that Reamer stayed at respondent's house on weekends at the very least, and he and respondent slept in the same bed. Reamer had a garage door opener to two of the three residences where respondent resided during the relationship. Reamer kept some of his clothing in respondent's homes, showered and bathed there, and, at times, kept his vehicle in the garage. Reamer cooked and ate meals with respondent at her home and helped clean up afterwards. Reamer quarantined at respondent's home for a time during the COVID pandemic. Reamer and respondent entertained mutual friends at respondent's residence. Reamer and respondent communicated via text message on a daily basis. Respondent and Reamer spent time with each other's children "on a regular and frequent basis." Reamer's son, Vann, "hung out" at respondent's home, spent the night there on occasion, and celebrated his 21st birthday at respondent's home. Reamer, Vann, and Reamer's daughter Willa participated in a Nutter family tradition of wearing matching Christmas pajamas, photos of which were posted on Facebook holding themselves out as one family unit. Respondent and Reamer looked at homes together during the two times respondent moved during the relationship. At times, Reamer stayed at respondent's home when respondent was away. Respondent and Reamer attended numerous social events together as a couple. The couple took numerous vacations together, even with travel significantly restricted (due to the COVID pandemic). The court concluded that respondent and

Reamer had "far more than a weekend relationship." They spent "substantial time together" during the week, on weekends, and with their children.

¶ 38    Under the third factor, the nature of the activities engaged in, the court analogized this matter to the facts of *In re Marriage of Churchill*, 2022 IL App (1st) 210026. The court reiterated that respondent and Reamer had a monogamous sexual relationship. They shared the same bed together when Reamer stayed at respondent's home. Further, Reamer kept an eye on respondent's household when respondent was hospitalized or out of town. The couple ate meals together at home and dined out frequently. They celebrated holidays and birthdays together, attended concerts and social events, traveled, and purchased gifts for each other and for the other's children. In addition, respondent and Reamer held themselves out as a family unit "as they intertwined themselves with each other's children," for which, according to the court, "social media postings and photos paint a compelling picture." Again, the court cited the photos of the matching Christmas pajamas and cited other family activities such as picking apples, carving pumpkins, and going to a gun range.

¶ 39    Turning to the fourth factor, the interrelation of personal affairs, the court acknowledged the absence of evidence that respondent and Reamer shared bank accounts, credit cards, or other finances. However, the court found that respondent supported "her and [Reamer's] luxurious lifestyle with [petitioner's] monthly maintenance payments." The court explained that the disparity in respondent's and Reamer's financial positions was "such that in many ways they were akin to a single-income household."

¶ 40    Expressly, the court cited the testimony of McKenna. McKenna testified that respondent was in a significantly stronger financial position than Reamer. McKenna found that respondent's expenditures increased substantially as her relationship with Reamer developed. While Reamer

would occasionally send respondent Zelle payments, the court found that there was no way Reamer could have afforded the lifestyle that he and respondent enjoyed as a couple and that Reamer's reimbursements "were a small fraction of the total amounts that [respondent] spent on [Reamer] during their relationship." It was McKenna's opinion that respondent "likely supported [Reamer] during a time of financial duress for him." Also, according to McKenna, respondent spent "a significant amount of money" on expensive Robert Graham shirts for Reamer. Respondent also gifted Reamer a 1976 Les Paul custom guitar. The court described how, from the financial records, McKenna "opined that there is a clear indication that [respondent] and [Reamer] were 'dwelling together.' " The court stated that it did not give any weight to McKenna's specific opinion that respondent and Reamer were "dwelling together" because there was no indication that McKenna looked at the totality of the circumstances and considered the cohabitation factors. Instead, the court stated that it gave "appropriate weight" to McKenna's opinion that respondent was in a significantly stronger financial position than Reamer and that for the time period analyzed, Reamer reimbursed respondent a total of $11,535, which was $119,363 short of respondent's likely expenditures on Reamer.

¶ 41 The court then noted that there was evidence that the couple was using respondent's address as Reamer's address. Reamer was involved with respondent's searches for new homes. Respondent sent Reamer numerous emails discussing her divorce case and litigation strategy, even forwarding him information from her attorney about cohabitation rules. The court also considered the interrelation of personal affairs in how respondent and Reamer engaged in activities that included their children "which resulted in a blended family unit." The court noted that Reamer stayed at respondent's home when she was not present to watch respondent's son and pets. Respondent's two children referred to Reamer as "Dadford" (a take on Reamer's name of

"Bradford"). Respondent and Reamer had meals together with each other's children, attended cultural events with the children, celebrated birthdays and holidays together, exchanged gifts, and traveled with respondent's children. Photos showed Reamer and his children participating in the "Nutter family tradition" of wearing matching Christmas pajamas. The court "frankly" considered the Christmas photos "powerful evidence of an intertwined, blended family unit, just like a married couple with stepchildren."

¶ 42    Under the fifth factor, whether they vacationed together, the court noted respondent and Reamer traveled together often, despite the ban on travel due to stay-at-home orders related to the COVID pandemic. They went to Florida and Arizona multiple times, including a trip with Keenan to look at colleges. They went to New York with respondent's children to celebrate Kira's 20th birthday. They took a trip to Germany with respondent's sister and brother-in-law. They also spent "substantial time together with overnight stays in Chicago." Finally, considering the sixth factor, whether they spent holidays together, the court noted examples of holidays and "special days" respondent and Reamer spent together, including Christmas Eve and Christmas Day, New Year's Eve, birthdays, Valentine's Day, St. Patrick's Day, Father's Day, Mother's Day, Halloween, Thanksgiving, Memorial Day, Independence Day, and Labor Day.

¶ 43    The court then returned to the issue of the text messages. The court noted digital evidence has been found to be relevant and probative on the issue of cohabitation. See, *e.g.*, *In re Marriage of Hubble*, 2022 IL App (4th) 200657-U (text messages); *In re Marriage of Walther*, 2018 IL App (3d) 170289 (Facebook posts); *Miller*, 2015 IL App (2d) 140530 (same). The court determined that the missing text messages between respondent and Reamer "could have provided further evidence on a number of different topics" relevant to cohabitation, including the frequency Reamer

was at respondent's home, expressions of commitment, a desire to be married, and discussions related to finances, the children, activities together, and how to avoid a finding of cohabitation.

¶ 44 The court stated that it did not use the six factors as "simply a checklist." Rather, it weighed "the seriousness or magnitude of each given factor" considering the totality of the circumstances. The court concluded that respondent and Reamer were in an "exclusive, monogamous relationship of over three years with the intended permanence and mutual commitment to that relationship." Respondent and Reamer "spent a substantial amount of time together doing various activities, including with their children, similar to that of a married couple." Respondent financially supported Reamer and enabled Reamer to live a lifestyle in accord with respondent's standard of living. Respondent and Reamer vacationed together frequently and spent all or nearly all holidays and other special occasions together. Respondent and Reamer integrated their children into the relationship such that they were akin to one blended family unit. The court added that "[e]ven without adding in the inference that the deleted text messages and missing Facebook posts would be adverse to Respondent, the court finds that the evidence establishes cohabitation." The court expressly found that petitioner "has met his burden and proved that [respondent] was involved in a *de facto* marriage with *** Reamer." The court further stated that petitioner "has proved that [respondent] was cohabiting with *** Reamer on a resident, continuing, conjugal basis." As such, the court granted petitioner's motion to terminate maintenance.

¶ 45 The court then turned to the date cohabitation began for purposes of ordering reimbursement under the statute. See 750 ILCS 5/510 (West 2020). The court noted that respondent's and Reamer's relationship began in August 2018. The court then highlighted some points in time along the parties' relationship in 2018. The court noted, for instance, that the couple spent time in Chicago, including for Reamer's 50th birthday, a Pearl Jam concert, and hotel stays.

They attended a wedding in September 2018. During 2018, they also spent time with Vann, went to a gun range with Keenan, and attended a musical with Kira. The court further noted that the couple was together for Thanksgiving 2018, Christmas 2018, New Year's Eve 2018, New Year's Day 2019, and Valentine's Day 2019. On February 15, 2019, Reamer posted on Facebook that he was in a relationship with respondent. Also in February 2019, respondent and Reamer attended a charitable gala together, during which respondent charged approximately $2,500 to her credit card.

¶ 46 The court further observed that by March 2019, respondent had written to her attorney expressing concern about cohabitation. Specifically, the court noted that on March 4, 2019, respondent emailed her attorney and told him that she and Reamer had "taken precautions and *** modified [their] schedules, even though it feels like a big step backwards in [their] relationship." At that time, she also expressed an interest in asking petitioner to reduce the duration of maintenance in half in exchange for allowing cohabitation or marriage with Reamer. The court found that a fair reading of the March 4, 2019, email was that respondent and Reamer "were already cohabiting and the 'big step backwards' in their relationship was having to modify their activities—reduce their activities, so to speak—in an effort to avoid a cohabitation finding." On March 7, 2019, respondent again emailed her attorney, inquiring about "guidelines" regarding cohabitation and again asking about decreasing the number of years of maintenance in exchange for allowing cohabitation and marriage. Respondent forwarded the emails between her and her attorney to Reamer, telling him that they "shouldn't worry so much about the cohabitation rule." The court stated that "[i]t then seemed to be full steam ahead again in their relationship." The court noted that on March 10, 2019, respondent charged over $4,000 on her credit card for a future flight with Reamer to Germany. The couple attended another wedding in March 2019. And on March

26, 2019, respondent charged more than $9,000 on her credit card at the Ritz Carlton in Amelia Island, Florida for a vacation she took with Reamer.

¶ 47  Ultimately, the court set March 26, 2019, as the date cohabitation began. The court explained that by that date, respondent and Reamer had been in the relationship for about eight months, they held themselves out as being in a committed relationship, they had integrated their children into the relationship as a family unit, and respondent had been making significant purchases for herself and Reamer. The court recognized several facts as supporting a finding that cohabitation occurred after March 26, 2019. Nevertheless, the court found those facts were "simply further corroborating evidence that cohabitation had been occurring and was continuing to occur." Hence, the court ordered respondent to reimburse petitioner for all maintenance paid from March 26, 2019, forward.

¶ 48  The court memorialized its oral findings in a written order dated March 25, 2024. The court continued the matter for a determination of the amount of repayment of maintenance. See 750 ILCS 5/510(c) (West 2018). By subsequent order of April 23, 2024, the court entered a judgment in favor of petitioner and against respondent for $1,019,701.61, representing the reimbursement respondent owed petitioner upon maintenance being terminated retroactive to March 26, 2019. The court also found its rulings "final and appealable pursuant to" Illinois Supreme Court Rule 304(a) (eff. March 8, 2016). On May 17, 2024, respondent filed her notice of appeal from the court's orders of March 25 and April 23, 2024. This court docketed the appeal as case No. 2-24-0319.

¶ 49  On June 4, 2024, the court issued its reserved ruling granting petitioner's motion for discovery sanctions (attorney fees) filed September 5, 2023. The court ordered respondent to reimburse petitioner for attorney fees incurred between April 13, 2023, and July 12, 2023, due to

various discovery violations in the total sum of $4,610. On July 5, 2024, respondent filed a notice of appeal from the orders of June 4, 2024, April 23, 2024, and March 25, 2024. This court docketed the appeal as case No. 2-24-0396. On respondent's motion, we consolidated the two appeals for decision.

¶ 50                                    II. ANALYSIS

¶ 51    On appeal, respondent argues: (1) the trial court abused its discretion in ordering sanctions under Illinois Supreme Court Rule 219(c) (eff. July 1, 2002); (2) the trial court erred in admitting and relying upon the testimony of McKenna on the issue of cohabitation; (3) the trial court committed reversible error in finding a *de facto* marriage by cohabitation; (4) the trial court's determination of the date cohabitation began is against the manifest weight of the evidence; and (5) the trial court's order that respondent reimburse petitioner $4,610 for attorney fees should be vacated or reversed.

¶ 52    Prior to addressing respondent's arguments, we note that petitioner asks us to strike respondent's brief for failure to comply with Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020). We have analyzed petitioner's request and agree that there are instances in which respondent fails to cite to the record on appeal in both the statement of facts and argument section of her brief. Thus, certain aspects of respondent's brief technically contravene Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020). However, as these deficiencies are not so severe as to hinder or preclude our review, we decline to strike respondent's brief. Still, we admonish litigants to ensure compliance with the supreme court rules in any submissions. See Ill. S. Ct. R. 341 (eff. Oct. 1, 2020). With this preliminary matter resolved, we now turn to the merits of respondent's appeal.

¶ 53                                    A. Sanctions

¶ 54    Respondent first argues that the trial court abused its discretion in ordering sanctions under Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) due to discovery violations. According to respondent, the trial court failed to (1) comply with Rule 219(c)'s requirement of a written order where sanctions are imposed and (2) identify and weigh all relevant factors prior to ordering sanctions. Even assuming sanctions were appropriate, respondent contends that the sanctions ordered by the court were not reasonable under the circumstances.

¶ 55    Pretrial discovery is intended to enhance the truth-seeking process, enable attorneys to better prepare for trial, eliminate surprise, and promote an expeditious and final determination of controversies in accordance with the substantive rights of the parties. *Greco v. Orthopedic & Sports Medicine Clinic, P.C.*, 2015 IL App (5th) 130370, ¶ 41; *King v. American Food Equipment Co.*, 160 Ill. App. 3d 898, 910 (1987). Thus, good-faith compliance with discovery rules is desirable and necessary. *King*, 160 Ill. App. 3d at 910. To that end, Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) allows a trial court to impose sanctions upon any party who "unreasonably fails to comply" with any provision of the supreme court's discovery rules or any order entered pursuant to those rules. *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998); *In re Marriage of Keegan*, 2022 IL App (2d) 190495, ¶ 38. Rule 219(c) provides a nonexclusive list of possible sanctions that a court may impose, where just, including barring the offending party from filing any other pleading relating to any issue to which the refusal or failure relates, barring the offending party from maintaining any particular claim, counterclaim, third-party complaint, or defense relating to that issue, or barring a witness from testifying concerning that issue. Ill. S. Ct. R. 219(c) (eff. July 1, 2002); *Keegan*, 2022 IL App (2d) 190495, ¶ 38.

¶ 56    The purpose of imposing sanctions under Rule 219(c) is to "coerce compliance with discovery rules and orders, not to punish the dilatory party." *Shimanovsky*, 181 Ill. 2d at 123.

Sanctions are used "to combat abuses of the discovery process and maintain the integrity of the court system." *Locasto v. City of Chicago*, 2014 IL App (1st) 113576, ¶ 27. Sanctions imposed by a court for discovery violations "must be just and proportionate to the offense." *Gonzalez v. Nissan North America, Inc.*, 369 Ill. App. 3d 460, 464 (2006). A just order of sanctions is one that, to the degree possible, ensures both discovery and a trial on the merits. *Shimanovsky*, 181 Ill. 2d at 123.

¶ 57    The factors a court must consider in determining whether to impose a sanction and, if so, the sanction to impose include (1) surprise to the adverse party, (2) the prejudicial effect of the testimony or evidence, (3) the nature of the testimony or evidence, (4) the diligence in seeking the discovery, (5) the timeliness of the adverse party's objection to the testimony or evidence, and (6) the good faith of the party offering the testimony or evidence. *Shimanovsky*, 181 Ill. 2d at 123. We will refer to these factors as the *Shimanovsky* factors. No single factor controls whether a court may issue sanctions and each situation presents a unique factual scenario that bears on the propriety of a particular sanction. *Locasto*, 2014 IL App (1st) 113576, ¶ 26. The decision to impose a particular sanction under Rule 219(c) is discretionary. *Shimanovsky*, 181 Ill. 2d at 120. Accordingly, only a clear abuse of discretion justifies reversal. *Shimanovsky*, 181 Ill. 2d at 120. The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

¶ 58    Rule 219(c) provides that a judge "shall set forth with specificity the reasons and basis of any sanction so imposed either in the judgment order itself or in a separate written order." Ill. S. Ct. R. 219(c) (eff. July 1, 2002). The purpose of the specificity requirement is to allow the reviewing court to make an informed and reasoned review of the decision to impose sanctions. See

*Kellett v. Roberts*, 276 Ill. App. 3d 164, 172 (1995) (discussing specificity requirement for sanctions imposed pursuant to Illinois Supreme Court Rule 137). However, Illinois courts have held that a trial court's failure to set forth the reasons for a sanction does not constitute *per se* reversible error. *Jackson v. Mount Pisgah Missionary Baptist Church Deacon Board*, 2016 IL App (1st) 143045, ¶ 61; *Glover v. Barbosa*, 344 Ill. App. 3d 58, 63 (2003); *Chabowski v. Vacation Village Ass'n*, 291 Ill. App. 3d 525, 528 (1997). This is especially true where the trial court grants a written motion that sets forth the reasons for the sanction and those reasons are supported by the record. See *Keegan*, 2022 IL App (2d) 190495, ¶ 51 (noting that an order imposing sanctions "may be affirmed, even absent specific reasons in the written order, when entered in accord with a written motion or where the reason for the sanction can be surmised by the record").

¶ 59    In this case, the trial court did not explicitly state the reasons or basis for imposing sanctions in its written order. Nonetheless, our ability to address the propriety of sanctions is in no way hindered by the absence of a written rationale from the trial court. The court's written sanctions order refers to the "reasons stated on the record." We have the transcript of the hearing that resulted in the sanctions order and thus, the court's reasons and basis for imposing sanctions. Moreover, even without the transcript, we could sufficiently determine the court's rationale based on the various motions petitioner filed concerning respondent's alleged discovery violations and request for sanctions. See *Keegan*, 2022 IL App (2d) 190495, ¶¶ 51-52 (acknowledging the absence of the court's reasons for imposing sanctions in its written order, but noting that sanctions order was entered in accord with the respondent's written motion and the transcript from the hearing lists the court's rationale with specificity).

¶ 60    Petitioner also argues that the sanctions should be reversed because, in imposing sanctions, the trial court did not identify or weigh the *Shimanovsky* factors. According to petitioner, that, by

itself, constitutes an abuse of discretion. However, respondent does not cite any authority for her claim that the trial court's failure to expressly weigh and identify the *Shimanovsky* factors automatically constitutes an abuse of discretion. As such, that argument has been forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring the appellant's brief to include argument "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and providing that "[p]oints not argued are forfeited"); *Plaintiff 1 v. Board of Education of Lake Forest High School District 115*, 2024 IL App (2d) 230173, ¶ 35 (noting that where a party does not offer meaningful authority in support of its argument, the argument is forfeited). More important, an application of the *Shimanovsky* factors leads us to conclude that the trial court acted within its discretion in determining that sanctions were warranted in this case.

¶ 61    Regarding the first *Shimanovsky* factor, respondent simply asserts that "it is hard to envision what the detrimental surprise would be to [petitioner] in not having the text messages available." We find this argument disingenuous considering that respondent's actions made it all but impossible to discern the precise content of any text messages between her and Reamer, and, therefore, the impact on petitioner's motion to terminate maintenance.

¶ 62    Further, we find that petitioner could reasonably claim that he was surprised by the deletion of the text messages. On June 11, 2021, petitioner filed the motion to terminate maintenance. Petitioner alleged that respondent had been cohabiting with Reamer on a resident, continuing conjugal basis. Just three days later, petitioner filed a supplemental request to produce, asking for, *inter alia*, copies of all text messages between respondent and Reamer. Respondent answered the supplemental request to produce on July 30, 2021. Nowhere in her answer did respondent indicate that the text messages had been deleted. Instead, she responded that it would be "overly

burdensome" to produce the communications. In other words, respondent's answer implied that the text messages existed, but that they would be too onerous to provide. It was not until six months later, in her affidavit of January 25, 2022, that respondent gave an entirely different explanation for her failure to produce the text messages. At that time, despite being aware of the June 2021 production demand, respondent claimed that all text messages between her and Reamer had been deleted when the couple broke up (which was at least two months after the text messages were requested). Respondent further claimed that she sold her phone and changed carriers months after the text messages were requested. This latter action eliminated any opportunity to retrieve the text messages from the phone. Given these facts, the first *Shimanovsky* factor weighs heavily in favor of petitioner. See *Peal v. Lee*, 403 Ill. App. 3d 197, 205 (2010) ("[T]he real surprise is that a litigant would have the audacity to discard his old hard drive and delete tens of thousands of electronic files with sophisticated data-wiping programs and then cry foul that his opponents should not be surprised.").

¶ 63     Turning to the second factor, respondent states that "a slight but potential prejudicial effect on [petitioner] is the possibility some missing text messages may have corroborated his case on cohabitation (then again, they may not)." Respondent adds that the text messages were a "red herring" because the trial court ultimately concluded that the evidence would establish cohabitation even without adding in the inference that the deleted text messages would be adverse to her. Again, we find this argument disingenuous given that it was respondent who deleted the text messages, thereby making it all but impossible to ascertain the exact impact of the text messages on petitioner's case. And respondent's stance disregards the point of sanctions in a case like this. When one party destroys evidence after it is requested in discovery, the party that asked for the evidence is prejudiced because it does not have the opportunity to examine the destroyed

evidence and determine the relevance of its content. In *Kubicheck v. Traina*, 2013 IL App (3d) 110157, a retained expert for the defense failed to timely disclose records relating to the frequency of his testimony for plaintiffs and defendants. The court affirmed the grant of a new trial and rebuffed the defendant's assertion that a new trial was not warranted because the plaintiff could point to no specific prejudice: "[the plaintiff] does not, and cannot, know what is contained in the materials [the expert] has *not* disclosed. It would be unfair to require [the plaintiff's] counsel to identify something important or prejudicial contained in documents that were improperly withheld from him and that remain within [the expert's] control." *Kubicheck*, 2013 IL App (3d) 110157, ¶ 41 (Emphasis in original.); see also *Shimanovsky*, 181 Ill. 2d at 121 (noting that, as a general rule, "a potential litigant owes a duty to take reasonable measures to preserve the integrity of relevant and material evidence," otherwise, the potential litigant "could circumvent discovery rules or escape liability simply by destroying the proof prior to the filing of a complaint"); *Peal*, 403 Ill. App. 3d at 204-05 (categorizing as "disingenuous" the plaintiff's claim that he was unaware that he should not delete certain programs and files on his computer where the defendant had repeatedly served the plaintiff with discovery requests regarding the device). We have the same situation in this case.

¶ 64    Additionally, respondent's attempt to minimize the prejudicial effect of the missing text messages on petitioner's case is unconvincing. Based upon the evidence that respondent and Reamer texted daily, the text messages could have established not only when Reamer was at respondent's residence, but any efforts respondent and Reamer took to conceal the nature of their relationship, as the trial court recognized. Considering this record, we conclude that the missing text messages could have potentially provided strong evidence against respondent on the issue of cohabitation. The second *Shimanovsky* factor therefore strongly weighs in petitioner's favor.

¶ 65    Respondent does not address the third (nature of the evidence) or fourth (diligence) *Shimanovsky* factors. However, we find that these two factors also weigh in petitioner's favor. As discussed above, the exact content of the text messages is unknown. But, as detailed above, respondent and Reamer texted daily during the time they dated. Respondent noted that this included days during which there were multiple texts going back and forth between her and Reamer. At a minimum, the content of these texts included discussions about the couple's activities and Reamer notifying respondent when he was traveling to her home.  Moreover, the text message log indicated that the couple met up not only on weekends, but during the week. Given the frequency with which the couple texted and the evidence known about the content of the texts, the nature of the texts could have been particularly significant. Moreover, petitioner was diligent in seeking discovery. Petitioner filed a supplemental request to produce the text messages on June 14, 2021, just three days after filing his motion to terminate maintenance. Petitioner subsequently filed a motion to compel production of the text messages within a month of receiving respondent's objection to the same. Under these facts and circumstances, petitioner's efforts were sufficiently diligent in seeking discovery.

¶ 66    Regarding the fifth factor, respondent argues that she "promptly interposed her objections to [petitioner's] discovery requests, including as 'overly burdensome.' " We do not dispute that petitioner timely objected to providing the text messages in her answer. However, the proper focus of this factor is on the behavior of the adverse party, *i.e.*, petitioner. See *Shimanovsky*, 181 Ill. 2d at 124 (noting that the fifth factor addresses "the timeliness of the adverse party's objection to the testimony or evidence"). In this case, petitioner timely contested the basis for respondent's failure to produce the missing text messages. Notably, petitioner filed a motion to compel answers to the supplemental request to produce in August 2021, asserting that respondent's objections to his

discovery requests "do not have a legal basis and [respondent] should be required to answer said requests properly." Petitioner followed up with several other motions for discovery-related relief regarding the missing text messages, culminating in the motion *in limine* filed in July 2023. Considering this record, we conclude that petitioner timely contested respondent's failure to produce the missing text messages. Therefore, the fifth *Shimanovsky* factor also favors petitioner.

¶ 67    Finally, respondent contends that the trial court barely, if at all, considered her good faith. Respondent contends that her actions in deleting the text messages were reasonable and justified because it was a routine practice of hers to delete text message strings every few weeks and she did not want to see Reamer's name on her phone. We disagree and find that the absence of good faith by respondent can be inferred from her actions after petitioner filed his supplemental request to produce the text messages. Significantly, respondent was not candid about her practice of deleting text messages. When she initially objected to producing the text messages, she did not indicate that she was unable to produce the text messages because they had been deleted. She merely stated that it was "overly burdensome." Again, respondent's answer implied that the text messages still existed. In any event, the evidence demonstrates that respondent deleted at least some of the text messages *after* receiving petitioner's supplemental request to produce. Respondent received the supplemental request to produce in June 2021, yet she stated that she deleted text conversations with Reamer when the couple broke up. Accepting for this purpose respondent's testimony that she and Reamer broke up in August 2021, this was approximately two months *after* petitioner requested the text messages. In addition, respondent admitted that she changed carriers and sold her cell phone about four months after petitioner requested the text messages. This latter action rendered impossible any attempt to retrieve text messages from the device. Respondent's actions of deleting the text messages, changing carriers, and disposing of her

cell phone after the text messages were requested by petitioner demonstrate a clear *lack* of good faith. The sixth *Shimanovsky* factor therefore favors petitioner.

¶ 68     Respondent also contends that the sanctions ordered were not reasonable under the circumstances in that they went "beyond the parameters and purposes of Rule 219(c)." In this regard, respondent emphasizes that a just order of sanctions under Rule 219(c) is one which, to the degree possible, ensures both discovery and a trial on the merits and which does not punish a dilatory party. Respondent then argues that the sanctions ordered by the trial court in this case "did not promote or insure [*sic*] a fair trial on the merits" because they "bore no relationship, reasonable or otherwise, to any 'withheld' information." According to respondent, barring her from testifying in her own case "is not in line with the conduct accused [and] serves no real purpose other than *** to punish [her] and unduly prejudice her case." We disagree.

¶ 69     At the outset, we observe that respondent does not argue that the sanctions the trial court imposed in this case are unauthorized by Rule 219(c). To the contrary, Rule 219(c) expressly allows the trial court to enter "such orders as are just" and permits the trial court to "impose *** an appropriate sanction." Ill. S. Ct. R. 219(c) (eff. July 1, 2002); *Buffington v. Yungen*, 322 Ill. App. 3d 152, 154 (2001). The rule includes a nonexclusive list of potential sanctions, including barring a witness from testifying concerning a particular issue. Ill. S. Ct. R. 219(c)(i)-(vii) (eff. July 1, 2002); *In re Marriage of Daebel*, 404 Ill. App. 473, 486 (2010); see also *City of Belleville v. Keller*, 2021 IL App (5th) 180562-U, ¶ 12 (holding that trial court did not abuse its discretion in imposing an adverse inference as a sanction under Rule 219(c)). Additionally, respondent does not identify what, if any, sanction she believes would have been appropriate under the circumstances. More important, we again emphasize the disingenuous nature of respondent's position. The record establishes that respondent deleted at least some of the text messages *after*

receiving petitioner's supplemental request to produce. In addition, respondent admitted that she changed carriers and sold her cell phone four months after petitioner requested the text messages. Considering that the central issue in this case was whether respondent and Reamer were cohabitating and the evidence suggested that, at a minimum, the content of these texts included discussions about the couple's activities and Reamer notifying respondent when he was traveling to her home, we cannot say that no reasonable trial judge would have barred respondent from testifying in her own case on the issue of cohabitation and drawn all inferences against her on cohabitation for her actions in deleting the text messages. Quite simply, the sanctions imposed by the trial court accomplished the dual goal of combatting abuses of the discovery process and maintaining the integrity of the court system. *Locasto*, 2014 IL App (1st) 113576, ¶ 27. Under these circumstances, we find the sanctions imposed by the trial court just and proportionate to the offense. See *Buehler v. Whalen*, 70 Ill. 2d 51, 67 ("Our discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation.").

¶ 70    In short, an application of the *Shimanovsky* factors in this case demonstrates that the trial court properly exercised its discretion in concluding that the imposition of sanctions was warranted. We therefore find that the trial court did not err in imposing the sanctions that it did.

¶ 71                              B. Forensic Accountant

¶ 72    Next, respondent argues that the trial court committed reversible error in admitting and relying upon the testimony of McKenna, a forensic accountant, on the issue of cohabitation. According to respondent, a proper foundation was never laid for McKenna's testimony as he "was never qualified as an expert, let alone an expert on cohabitation." Respondent further contends that the trial court's error in admitting McKenna's testimony was compounded because the trial court expressly relied upon his testimony in finding that she and Reamer were cohabitating. Respondent

asserts that this was improper because McKenna never interviewed her or Reamer, McKenna's opinions relied on incomplete data, and McKenna's conclusions were premised on "some wildly ridiculous and baseless assumptions and connections."

¶ 73 Petitioner responds that the testimony of McKenna was properly admitted. Petitioner posits that the record contains ample evidence of McKenna's experience and knowledge in the field of forensic accounting. Petitioner asserts that to the extent that the factual bases for some of McKenna's findings were ultimately called into question, this went to the weight of the testimony rather than its admissibility.

¶ 74 "Generally, a witness may testify as an expert if he or she possesses 'experience and qualifications [that] afford him [or her] knowledge that is not common to laypersons.' " *People v. Harris*, 2023 IL App (2d) 210697, ¶ 34 (quoting *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006)), *abrogated on other grounds by People v. Redmond*, 2024 IL 129201. Moreover, the proposed testimony "must 'aid the trier of fact in reaching its conclusions.' " *Harris*, 2023 IL App (2d) 210697, ¶ 34 (quoting *Thompson*, 221 Ill. 2d at 428). "There is no 'predetermined formula' specifying how an expert acquires the knowledge that renders him or her an expert." *Harris*, 2023 IL App (2d) 210697, ¶ 34 (quoting *Thompson*, 221 Ill. 2d at 428 (internal quotation marks omitted)). "Such knowledge may be acquired through study, practical experience, training, education, or research." *Harris*, 2023 IL App (2d) 210697, ¶ 34. "Any weakness in the bases of an expert's opinion goes to the weight of the testimony; it should not affect its admissibility if the facts, data, or opinions are reasonably relied upon by experts in the relevant field." *Harris*, 2023 IL App (2d) 210697, ¶ 34. The decision to admit expert testimony is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *City of Chicago v. Concordia Evangelical Lutheran Church*, 2016 IL App (1st) 151864, ¶ 73. An abuse of discretion

occurs only if no reasonable person would agree with the decision of the trial court. *Prairie v. Snow Valley Health Resources, Inc.*, 324 Ill. App. 3d 568, 571 (2001).

¶ 75 Here, we find no abuse of discretion in the admission of McKenna's testimony as an expert in the field of forensic accounting. Initially, we observe that McKenna testified to his education and experience in the field of accounting. McKenna stated that he received a degree in accountancy from the University of Notre Dame in 2000 and passed the certified public accountancy (CPA) examination in 2001. Thereafter, he worked for multiple accounting firms performing a variety of financial analyses and then founded McKenna Capital, focusing on portfolio management. McKenna also testified to his experience as a consultant in family law cases and his familiarity with reviewing documents such as tax returns, bank statements, and credit card statements. Considering McKenna's education, training, and practical experience, the trial court could reasonably conclude that McKenna possessed experience and qualifications that afford him knowledge that is not common to laypersons and which would aid the trier of fact. See *Harris*, 2023 IL App (2d) 210697, ¶ 34. As such, we cannot say that no reasonable person would agree with the trial court. Hence, the trial court did not err in certifying McKenna as an expert in forensic accounting.

¶ 76 Moreover, contrary to respondent's claim, the trial court did not credit McKenna's conclusions or opinions on the issue of *cohabitation*. Instead, the court credited, and gave "appropriate weight" to, McKenna's opinion that respondent was in a significantly stronger financial position than Reamer. In this regard, McKenna analyzed respondent's and Reamer's financial records and determined that there was no way Reamer could have "reimbursed" respondent for all the expenses she paid on Reamer's behalf. This was completely proper and appropriate considering McKenna's knowledge and experience. Respondent's other assertions

(that McKenna never interviewed her or Reamer, relied on an incomplete data set, and made baseless conclusions) go to the weight of the testimony. *Harris*, 2023 IL App (2d) 210697, ¶ 34. In short, we find no abuse of discretion in the trial court admitting and relying on McKenna's testimony regarding the financial positions of respondent and Reamer.

¶ 77                                    C. *De Facto* Marriage

¶ 78     Next, respondent contends that the trial court's finding that she and Reamer had a *de facto* marriage by cohabitation was against the manifest weight of the evidence. According to respondent, the totality of the circumstances demonstrates that she and Reamer had an "intimate personal (and dating) relationship" that did not achieve the gravitas of a marriage. Petitioner responds that the evidence of record overwhelmingly supports the trial court's finding of a *de facto* marriage by cohabitation. According to petitioner, the totality of the circumstances reveals a family blending, a sense of permanence, and a deep level of commitment between respondent and Reamer.

¶ 79     Section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510(c) (West 2020)) states in relevant part that "[u]nless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2020). The rationale for the rule is that it would be inequitable for a person to receive maintenance while he or she is involved in a husband-and-wife relationship with a new paramour but does not legally formalize it. *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). As Illinois courts have recognized, " '[w]here the relationship has achieved a permanence sufficient for the trial court to conclude that it has become a substitute for marriage, equitable principles warrant a conclusion that the spouse

has abandoned his or her rights to support from the prior marriage ***.' " *In re Marriage of Weisbruch*, 304 Ill. App. 3d 99, 105 (1999) (quoting *In re Marriage of Herzog*, 761 S.W.2d 267, 268 (Mo. Ct. App. 1988)). The party seeking termination of maintenance has the burden of establishing that the receiving spouse is cohabiting with another. *Miller*, 2015 IL App (2d) 140530, ¶ 40. A court of review will not reverse a finding as to the existence or nonexistence of a *de facto* marriage by cohabitation unless it is against the manifest weight of the evidence. *Miller*, 2015 IL App (2d) 140530, ¶ 40. A finding is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *Graham v. Van Rengen*, 2024 IL App (2d) 230611, ¶ 53.

¶ 80　　In determining whether the party seeking the termination of maintenance has satisfied his or her burden, Illinois courts examine the totality of the circumstances, considering a non-exhaustive list of six factors. *Miller*, 2015 IL App (2d) 140530, ¶ 47. Those factors are: (1) the length of the relationship between the receiving spouse and his or her partner; (2) the amount of time the receiving spouse and his or her partner spend together; (3) the nature of the activities in which the receiving spouse and his or her partner engage; (4) the interrelation of the personal affairs, including finances, of the receiving spouse and his or her partner; (5) whether the receiving spouse and his or her partner vacation together; and (6) whether the receiving spouse and his or her partner spend holidays together. *Miller*, 2015 IL App (2d) 140530, ¶ 40. No one factor is controlling. *In re Marriage of Susan*, 367 Ill. App. 3d 926, 930 (2006).

¶ 81　　In *Miller*, we cautioned that while a consideration of the non-exhaustive list of six factors is helpful to any maintenance-termination analysis, it is not a checklist whereby a court merely notes the presence of certain facts that fit into each factor. *Miller*, 2015 IL App (2d) 140530, ¶¶ 46, 48, 60. Rather, the facts, in their totality, "must attain a certain gravitas to establish a *de facto*

marriage." *Miller*, 2015 IL App (2d) 140530, ¶ 46. We observed that the six factors "focus greatly on the emotional and social components of a relationship as opposed to practical and financial aspects that life partners share." *Miller*, 2015 IL App (2d) 140530, ¶ 48. Moreover, despite their focus on the emotional components of a *de facto* marriage, we found that the six factors "miss a key emotional factor that is likely present in any *de facto* marriage: intended permanence and/or *mutual* commitment to the relationship." (Emphasis in original.) *Miller*, 2015 IL App (2d) 140530, ¶ 48. Thus, in distinguishing between an intimate-dating relationship and a marriage-like relationship, we explained:

> "Intimate dating relationships have companionship and exclusive intimacy, whereas marriage-like relationships, while likewise having companionship and exclusive intimacy (not necessarily sexual but such that the former spouse does not engage in a similar relationship with a third person), also have a deeper level of commitment, intended permanence, and, unless reasonably explained, financial or material partnership (which would most commonly come in the form of a shared household)." *Miller*, 2015 IL App (2d) 140530, ¶ 61.

With these principles in mind, we hold that the trial court's finding that respondent and Reamer were involved in a *de facto* marriage was not against the manifest weight of the evidence because not only do the six factors support a finding of a *de facto* marriage, other facts establish a deep level of family blending and time spent together, intended permanence, mutual commitment, and a financial or material partnership.

¶ 82     The first factor concerns the length of the parties' relationship. Respondent and Reamer began dating in August 2018. The couple shared a monogamous and sexual relationship. Reamer testified that the relationship ended in October 2021. Respondent indicated that she and Reamer

broke up a couple of months earlier—in August 2021. Regardless of whether the relationship ended in August or October 2021, respondent and Reamer were together for at least three years. These facts suggest a *de facto* husband-and-wife relationship. See *Walther*, 2018 IL App (3d) 170289, ¶ 27 (holding that relationship that lasted for nearly two years and included nearly one year of cohabitation supported a *de facto* husband-and-wife relationship).

¶ 83    We consider together the second factor (amount of time spent together) and the third factor (nature of activities engaged in) as they are closely connected in this case. Both respondent and Reamer admitted that their routine was to spend, at the very least, every weekend together at respondent's home from Friday until Reamer had to return to work on Monday. Respondent and Reamer communicated via text message daily. They shared a monogamous and sexual relationship. The couple ate meals at respondent's home and dined out at bars and restaurants frequently. They celebrated holidays, birthdays, and family milestones together. They attended concerts, plays, and weddings, went to charity events (including one with their children), and met socially with friends. They also traveled frequently—locally (in downtown Chicago), domestically, and internationally. In addition, Reamer quarantined at respondent's home for a time during the COVID lockdown. Respondent and Reamer also spent time with each other's children on a regular and frequent basis. For instance, Vann (Reamer's son) "hung out" at respondent's home, spending the night there on occasion and celebrating his 21st birthday with a party there. Reamer, Vann, and Willa (Reamer's daughter) participated in the Nutter family tradition of wearing matching Christmas pajamas. Respondent and Reamer also participated in activities with respondent's children, including picking apples, carving pumpkins, and going to a gun range. In short, the evidence of record shows that respondent and Reamer spent a significant amount of time together and engaged in a wide variety of activities together as a couple and with family and

friends. Therefore, factors two and three support a cohabitation finding. See *In re Marriage of Miller*, 2024 IL App (3d) 230098, ¶ 56 (finding that couple, who spent time together at the former wife's home and by traveling, grocery shopping, and attending events for the former wife's children, suggested a *de facto* marriage).

¶ 84 The fourth factor concerns the interrelation of the couple's personal affairs, including finances. As the trial court noted, there is no evidence of record that respondent and Reamer shared bank accounts, credit cards, or other finances. However, the court found that respondent supported "her and [Reamer's] luxurious lifestyle with [petitioner's] monthly maintenance payments." The court elaborated that the disparity in respondent's and Reamer's financial positions was "such that in many ways they were akin to a single-income household." While Reamer would occasionally send respondent Zelle payments, the court found that there was no way Reamer could have afforded the lifestyle that he and respondent enjoyed as a couple and that Reamer's reimbursements "were a small fraction of the total amounts that [respondent] spent on [Reamer] during their relationship." McKenna opined that respondent was in a significantly stronger financial position than Reamer. Indeed, the record establishes that between 2018 and 2021, Reamer's taxable wages ranged between $50,000 and $63,000. McKenna noted that Reamer reimbursed respondent a total of $11,535, which was $119,363 short of respondent's likely expenditures on Reamer.

¶ 85 Aside from financial matters, respondent's and Reamer's personal affairs were intertwined in other ways. For instance, Reamer had a garage-door opener to two of the three homes where respondent resided during their relationship. Reamer was involved when respondent went house hunting. Reamer helped respondent during her moves. Respondent sent Reamer numerous emails discussing her divorce case and litigation strategy, even forwarding him information from her attorney about cohabitation rules. As noted earlier, the couple frequently engaged in activities that

included their children, which, as the trial court found "resulted in a blended family unit." The record shows that Reamer stayed at respondent's home when she was not present to watch Keenan (respondent's son) and pets. Reamer's children visited him at respondent's homes and his son overnighted at respondent's homes multiple times. Photos showed Reamer and his children participating in the "Nutter family tradition" of wearing matching Christmas pajamas.

¶ 86    Reamer also developed a close relationship with respondent's children and respondent developed a close relationship with Reamer's children. Respondent's children referred to Reamer by a nickname, "Dadford." Kira, respondent's daughter, testified that she and Reamer "spent a good deal of time together." Kira testified that Reamer "acted not only as a friend but kind of a mentor." Kira acknowledged that she told Reamer that she loved him. She also recalled Reamer telling her that he loved her. Kira considered herself, Keenan (her brother), Reamer, and respondent a "family unit" during the time they spent together. Kira testified that Reamer treated her "with the same respect he treated his children and so in that way perhaps you could synthesize that he treated me like his daughter." Kira further testified that during the time Reamer and respondent were dating, she developed a relationship with Reamer's children, Vann and Willa. Reamer's children spent holidays with Kira and her family, including Christmas. Further, Vann would occasionally spend the night at respondent's home. As the trial court found, this evidence in its totality supports a finding that respondent and Reamer created "an intertwined, blended family unit, just like a married couple with stepchildren." This evidence regarding the interrelation of respondent's and Reamer's financial and personal affairs suggests the appearance of a *de facto* husband-and-wife relationship.

¶ 87    The fifth factor examines whether the parties traveled together. The record shows that respondent and Reamer frequently traveled together and with respondent's children and other

family members. Respondent and Reamer went to Florida twice. They traveled to Germany with respondent's sister and brother-in-law. The couple also went to Arizona multiple times, including once with Keenan so that Keenan could visit Arizona State University. The couple went to New York with Kira and Keenan to celebrate Kira's 20th birthday. In addition, respondent and Reamer frequented hotels in Chicago, staying overnight in the city on numerous occasions. The frequent vacations taken by the couple, combined with the involvement of family members on several of the trips, supports a finding that respondent and Reamer were in a *de facto* husband-and-wife relationship. See *Miller*, 2024 IL App (3d) 230098, ¶¶ 71-74 (finding that this factor favored a finding of a *de facto* marriage, where couple took seven or eight trips; the fact that the trips often involved family members "showed a level of commitment that was more akin to a *de facto* marriage"). Respondent claims that because she also vacationed separately with family and friends, this factor weighs against finding a *de facto* marriage relationship. Even so, it does not diminish the fact that respondent and Reamer took frequent vacations both as a couple and with other family members.

¶ 88    The sixth factor looks at whether the couple spent holidays and special occasions together. The record shows that respondent and Reamer celebrated all major holidays and special events together, including Mother's Day, Father's Day, and birthdays. All or some of the parties' children were present on many of these occasions. Further, Reamer and his children participated in the Nutter family tradition of wearing the same Christmas-themed pajamas. The record further establishes that respondent and Reamer exchanged Christmas gifts. Among the Christmas gifts that respondent bought for Reamer were tickets to a Rolling Stones concert in Chicago and a custom-made Les Paul guitar. Reamer also exchanged gifts with respondent's children and respondent exchanged gifts with Reamer's children. Reamer celebrated Kira's graduation from

college by attending a dinner party and Vann had a party for his 21st birthday at respondent's home. As noted above, Reamer also attended Kira's 20th birthday celebration in New York. Further, Kira testified that Reamer was present for her 21st birthday celebration, gifting her an Uber gift card and a jar of "anti-aging cream" as a joke. Given the numerosity of holidays and special occasions respondent, Reamer, and their family members spent together, we conclude that this factor also supports a finding of a *de facto* husband-and-wife relationship.

¶ 89    The trial court weighed "the seriousness or magnitude of each given factor" considering the totality of the circumstances, before concluding that respondent and Reamer were in an "exclusive, monogamous relationship of over three years with the intended permanence and mutual commitment to that relationship." Indeed, as the trial court determined, respondent and Reamer "spent a substantial amount of time together doing various activities, including with their children, similar to that of a married couple." Respondent financially supported Reamer and enabled Reamer to live a lifestyle in accord with respondent's standard of living. Respondent and Reamer vacationed together frequently and spent all or nearly all holidays and other special occasions together. Respondent and Reamer integrated their children into the relationship such that they were akin to one blended family unit.

¶ 90    Respondent insists that there was no "intended permanence" exhibited in this case. We disagree. In August 2019, Reamer emailed respondent, telling her that he "want[s] to put everything into [their] relationship" and that he has "no desire to be with anyone else." Reamer added that he is "devoted to US, our kids, and building a life together." (Emphasis in original.) In August 2020, Reamer emailed his mother and told her that although he and respondent are not married, they "hope to be married someday." Although Reamer never proposed marriage to respondent or bought her an engagement ring, he testified that marriage was something he and

respondent discussed but did not get around to because of the conditions of her divorce. Likewise, respondent evinced behavior consistent with intended permanence and mutual commitment by emailing her attorney in March 2019, indicating that she would like to revisit the possibility of decreasing the number of years of maintenance in exchange for removing the cohabitation and marriage constraints from her divorce settlement with petitioner.

¶ 91     In the context of analyzing the non-exhaustive factors, a court may consider a party's awareness of the legal consequences of cohabitation, especially where the parties alter their behavior to hide the true nature of the relationship. *Miller*, 2015 IL App (2d) 140530, ¶¶ 65-66; *Herrin*, 262 Ill. App. 3d at 577-78. The record in this case shows that respondent and Reamer were keenly aware of the legal consequences of cohabitation and that they altered their behavior to hide the nature of their relationship. As noted, respondent emailed her attorney on March 4, 2019, indicating that she was "worried about the cohabitation laws since [they] spoke." In the same email, respondent wrote that she and Reamer had "taken precautions and *** modified [their] schedules, even though it feels like a big step backwards in [their] relationship." During her testimony, respondent explained that she asked Reamer "not to stay at the home at all any more" and that they "stepped away from even visiting on the weekends at that time." In a subsequent email, respondent asked her attorney to send her "whatever useful material [he] has on cohabitation." Respondent acknowledged reading *Miller*, 2015 IL App (2d) 140530, and other cases which discuss cohabitation. She also was aware that there are various factors that a court considers in determining whether there is cohabitation. Respondent further testified that she and Reamer discussed what one can and cannot do in relation to cohabitation. She also shared with Reamer emails from her attorney discussing cohabitation. As noted above, for his part, Reamer

professed wanting to marry respondent, but he also understood that they could not, because of the cohabitation rules.

¶ 92    In short, an application of the factors set above, combined with evidence of the deep level of family blending and time spent together, the evidence of intended permanence, mutual commitment, and financial or material partnership, as well as respondent's and Reamer's awareness of the cohabitation rules, and the couple's altered behavior strongly supports a finding of a *de facto* marriage. As such, we conclude that the trial court's finding of a *de facto* husband-and-wife relationship was not against the manifest weight of the evidence.

¶ 93                                    D. Date of Cohabitation

¶ 94    Next, respondent contends that the trial court's determination of the date cohabitation began is against the manifest weight of the evidence. Section 510(c) of the Act (750 ILCS 5/510(c) (West 2020)) provides in relevant part as follows:

> "(c) Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis. *An obligor's obligation to pay maintenance *** terminates by operation of law on the date *** the court finds cohabitation began.* The obligor is entitled to reimbursement for all maintenance paid from that date forward." (Emphasis added.) 750 ILCS 5/510(c) (West 2020).

The date upon which cohabitation began is a question of fact and the trial court's determination on this issue will not be disturbed unless it is against the manifest weight of the evidence. See *In re Marriage of Andres*, 2021 IL App (2d) 191146, ¶¶ 49-50. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the decision is unreasonable,

arbitrary, or not based on the evidence. *Miller*, 2015 IL App (2d) 140530, ¶ 40. Merely demonstrating that the evidence also supports a different date cohabitation began does not establish that the trial court's decision was against the manifest weight of the evidence. *Andres*, 2021 IL App (2d) 191146, ¶ 49.

¶ 95    In this case, the trial court set the date cohabitation began as March 26, 2019. In deciding upon that date, the court considered a variety of facts. Initially, the court noted that respondent and Reamer began their relationship in August 2018. Shortly thereafter, the couple celebrated Reamer's 50th birthday at the Ritz Carlton in Chicago and attended a Pearl Jam concert. The court further noted that beginning in October 2018, the couple began integrating family members into the relationship. The court cited evidence that respondent and Reamer went with Keenan (respondent's son) to a gun range, spent time with Vann (Reamer's son), and attended a musical with Kira (respondent's daughter). The couple were also together for several holidays, including Thanksgiving, Christmas, and New Year's Eve in 2018. The couple celebrated Valentine's Day together in 2019, attended weddings and a charitable gala together in 2018 and 2019, and spent time together in Chicago. And, on February 15, 2019, Reamer posted on Facebook that he was in a relationship with respondent.

¶ 96    The court further observed that on March 4, 2019, respondent emailed her attorney expressing concern about cohabitation. In that email, respondent stated that she and Reamer had "taken precautions and *** modified [their] schedules, even though it feels like a big step backwards in [their] relationship." In the same email, respondent expressed an interest in asking petitioner about reducing the duration of maintenance in exchange for allowing cohabitation or marriage with Reamer. The court stated that a fair reading of the email was that respondent and Reamer "were already cohabiting and the 'big step backwards' in their relationship was having to

modify their activities—reduce their activities, so to speak—in an effort to avoid a cohabitation finding." The court added that three days later, on March 7, 2019, respondent emailed her attorney inquiring about "guidelines" for cohabitation. In the March 7, 2019, email, respondent again asked about decreasing the number of years of maintenance in exchange for allowing cohabitation and marriage. The court noted that respondent forwarded the emails between her and her attorney to Reamer, telling him that they "shouldn't worry so much about the cohabitation rule." The court opined that, at that point, "[i]t then seemed to be full steam ahead again in their relationship." The court noted that on March 10, 2019, respondent charged over $4,000 on her credit cards for a future trip with Reamer to Germany. In addition, in March 2019, respondent and Reamer took a vacation to Amelia Island in Florida. To this end, on March 26, 2019, respondent charged more than $9,000 on her credit card at the Ritz Carlton Amelia Island.

¶ 97    The court found that by March 26, 2019, respondent and Reamer had been in a relationship for approximately eight months, they had held themselves out as being in a committed relationship, they had integrated their children into the relationship as a family unit, and respondent had made significant purchases for herself and Reamer, including travel. The court acknowledged that "looking beyond March 26, 2019, there are certainly other dates that could be used for when cohabitation began." The court explained, however, that it "struggle[d] to get much farther than [respondent's] March[] 2019 emails to her attorney *** where she talked about perhaps having to modify their schedules, their behavior, and that it would feel like a big step backwards in their relationship."

¶ 98    Respondent contends that the trial court's determination of the date cohabitation began is against the manifest weight of the evidence. Respondent asserts that the date cited by the trial court, which was less than a month after entry of the judgment of dissolution (February 28, 2019),

was based primarily on the trial court's determination that she had communicated with her attorney regarding the definition of cohabitation and the fact that she and Reamer had taken a vacation together to Florida, during which respondent had charged over $9,000 on her credit card. Respondent argues that the trial court's determination was arbitrary and not supported by the record. Petitioner responds that the trial court properly supported its date of cohabitation finding based on evidence of record that fairly suggested that she and Reamer had already been cohabiting as of March 26, 2019.

¶ 99 Based on the record before us, we cannot say that the trial court's determination that cohabitation began March 26, 2019, was against the manifest weight of the evidence. As the trial court observed, by that time, the couple had begun integrating family members into the relationship as a family unit. They spent holidays and special occasions together, spent time in Chicago, and attended cultural and charitable events. In February 2019, Reamer posted on social media that he was in a relationship with respondent. Respondent expended thousands of dollars for her and Reamer for a trip to Florida and a future trip to Germany. Indeed, respondent's email exchange with her attorney early in March 2019 demonstrates how serious the relationship was at that point. Respondent indicated that she and Reamer were modifying their behavior and schedules to avoid a finding of cohabitation even though it felt to her like a "big step backwards" in their relationship. Respondent inquired about guidelines for cohabitation. Further, more than once respondent expressed an interest to her attorney in negotiating with petitioner a reduction in the duration of maintenance in exchange for marriage and cohabitation with Reamer. As the trial court concluded, a fair reading of the record suggests that the "big step backwards" in the couple's relationship was having to modify their activities in an effort to avoid a cohabitation finding. Considering this record, we cannot say a conclusion opposite that of the trial court is clearly apparent or that its

conclusion was unreasonable, arbitrary, or not based on the evidence. That the evidence may support a different date cohabitation began does not establish that the trial court's decision was against the manifest weight of the evidence. *Andres*, 2021 IL App (2d) 191146, ¶ 49.

¶ 100                                     E. Attorney Fees

¶ 101   Finally, respondent asserts that, to the extent she is successful on any of the other issues raised on appeal, the court's June 4, 2024, order granting petitioner's September 5, 2023, motion for sanctions and ordering that respondent reimburse petitioner $4,610 for attorney fees should be vacated or reversed. We reject respondent's petition for several reasons.

¶ 102   First, we have rejected the arguments respondent raises on appeal. Second, we note that respondent cites no authority in support of her argument. Thus, it is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring the appellant's brief to include argument "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and providing that "[p]oints not argued are forfeited"; *Plaintiff 1*, 2024 IL App (2d) 230173, ¶ 35 (noting that where a party does not offer meaningful authority in support of its argument, the argument is forfeited). Finally, we note that "[w]hen a sanction includes reasonable expenses and attorney fees, as here, the only restriction imposed by Rule 219(c) is that the award of fees 'must be related to misconduct arising from failure to comply with' the discovery rules." *Palos Community Hospital*, 2020 IL App (1st) 190633, ¶ 45 (quoting *Jordan v. Bangloria*, 2011 IL App (1st) 103506, ¶ 19). Here, respondent makes no contention that the monetary sanction ordered by the court did not comply with this restriction. For all these reasons, we reject respondent's argument relating to the propriety of the attorney fees as a sanction.

¶ 103                                     III. CONCLUSION

¶ 104   For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 105   Affirmed.